NATIONAL ASSOCIATION FOR the
ADVANCEMENT OF COLORED
PEOPLE et al., Plaintiffs,

v.

LANSING BOARD OF EDUCATION
et al., Defendants.

No. G305–72 C.A.

United States District Court,
W. D. Michigan, S. D.

May 17, 1976.

John W. Davis, Lansing, Mich., for plaintiffs.

Fred C. Newman, Newman & Mackay, Lansing, Mich., for defendants.

## OPINION

FOX, Chief Judge.

This school desegregation suit was commenced in 1972 to determine whether the Lansing Board of Education violated the constitutional rights of the district's schoolchildren by denying them equal educational opportunity on the basis of race.

The court recognizes that the issues involved are of particular interest and vital significance to all Lansing area citizens. Therefore, this opinion is aimed at communicating the factual and legal bases for the court's decision, not only to the parties and reviewing courts, but also to the community. For it is the hope of the court that a sincere civic involvement in implementing the terms of this decision will help improve the school system and strengthen the community, for citizens of all races, and for their children.

The jurisdiction of this court is properly invoked under 28 U.S.C. Sections 1331(a), 1343(3), and (4), this being a suit in equity authorized by 42 U.S.C. Sections 1983, 1988 and 2000d. Jurisdiction is also invoked under 42 U.S.C. Section 1981 and further invoked under 28 U.S.C. Sections 2201 and 2202, this being a suit seeking a declaration that the February 1, 1973 resolutions of the Lansing Board of Education are unconstitutional, and seeking also other relief.

Individual plaintiffs are children or parents of children who, as a result of the June 29, 1972 desegregation plan adopted by the Lansing Board of Education, attend desegregated schools. Plaintiff, National Association for the Advancement of Colored People, Lansing Branch, is an unincorporated association which sues on behalf of its membership who are members of the plaintiff class. Plaintiffs are bringing this action on their own behalf and on behalf of all persons in the City of Lansing similarly situated. The class action is proper under Fed.R. Civ.P. 23. Because of the notoriety of the case in Lansing, the members of the plaintiffs' class have adequate notice.

The original and supplemental complaints alleged that actions of the Lansing Board

of Education, especially the rescission of the June 29, 1972 desegregation plan (by its resolutions of February 1, 1973), were purposely taken to achieve segregative effects, in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution, and the Michigan Constitution. Plaintiffs' allegations that defendant has violated Michigan's State Constitution may properly be entertained by this court under the doctrine of pendent jurisdiction.

Following a full evidentiary hearing, the court issued a preliminary injunction on August 10, 1973, restraining the defendant Board of Education from implementing certain of its resolutions of February 1, 1973. The implementation of these resolutions would have effectively revised the Board's formal Policy Statement on Equal Educational Opportunity and would have nullified the desegregation plan which was voluntarily adopted by the Board on June 29, 1972 and partially implemented by it beginning in September 1972. The issues presently before the court are whether this preliminary relief should be made permanent, and whether school board officials are responsible for segregative conditions in the Lansing school system requiring further remedial action.

## I.

The essence of plaintiffs' complaint in this case is an allegation of constitutional violations involving an inequity or inequality in public education deliberately created, maintained, and perpetuated by school officials. For reasons discussed in detail throughout this opinion, the court finds that the Lansing elementary schools[1] have in fact been racially segregated and that these segregative conditions are being perpetuated even now. The court finds as a matter of demonstrable fact and established law that this condition of segregation resulted in inequitable and unequal educational opportunities for Black and White students. Educational inequity is a necessary consequence of racial discrimination in and separation of the schools. The reasons which explain this fact are complex, being intricately rooted in the tortured history of race relations of this nation. Over the years, Black experience has been unique in American history. No other racial or ethnic minority was systematically enslaved by the White majority. Rather than having suffered the temporary discomfort and annoyance of social ostracism common to first-generation European ethnic groups, Blacks for hundreds of years were subjected to legally and socially institutionalized economic, spiritual, psychological, social and educational deprivation.

It is appropriate to note Gunnar Myrdal's observation on slavery in his classic, An American Dilemma, in his chapter on "Inequality of Justice:"

"Under slavery the Negro was owned, bought, and sold as property; he was worked, housed, fed, and prevented from doing what he wished if it was contrary to the interests of his master. In general, the Negro slave had no 'rights' which his owner was bound to respect. Even if in legal theory the slave was given the status of a person under the law as well as the status of property, it was the latter viewpoint which, in practice, became the determining one. In the very relationship between master and slave it was inherent that—without recourse to courts—force and bodily punishment and, under certain circumstances, even the killing of the slave was allowed. '. . (A)ll slaveholders are under the shield of a perpetual license to murder,' exclaimed Hinton R. Helper in his unsparing onslought on the plantation class and the slavery institution. Thomas Jefferson saw clearly the moral danger of the slavery institution:

'The whole commerce between master and slave is a perpetual exercise of

---

1. Lansing secondary schools were not made an issue in this case, since they were integrated in 1966 pursuant to a plan adopted by the Board of Education. The Board successfully defended this plan in litigation brought against it, *Jipping, et al. v. Lansing School District,* 15 Mich. App. 441, 166 N.W.2d 472 (1968), leave to appeal denied by Supreme Court of Michigan, 382 Mich. 760 (1969).

the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other. Our children see this, and learn to imitate it. . . . The man must be a prodigy who can retain his manners and morals undepraved by such circumstances. *And with what execration should the statesman be loaded, who,* permitting one half the citizens to trample on the rights of the other, *transforming those into despots, and these into enemies, destroys the morals of one part, and the amor patriae of the other.* . . . [Can] the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that *these liberties are the gift of God?* That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that His justice cannot sleep forever.' " [2] (Emphasis supplied.)

Unfortunately, White attitudes originally attendant to the institution of slavery persisted after the adoption of the Thirteenth Amendment. Although legal slavery died, Americans created, during the four decades after the Civil War, a new legal and social pattern of discrimination based upon race. Many of these forms of institutionalized repression have persisted to the present, with the result that Black Americans are often denied the equality to which they are entitled in our constitutional democratic republic.

Inextricably intertwined with the dominating inescapable heritage of slavery and all its attendant dehumanizing ramifications, every aspect of the human condition of many Black people in America today is almost irremediably repressed. These continuing inhuman conditions of uncivilized servitude and inferior status have become known as vestiges of slavery.

The effects of this historical status of subservience and formalized inferiority continued to be pervasive. Past barriers to personal fulfillment and attainment cannot reasonably be minimized in assessing current impediments to equal opportunity. In the context of past officially sanctioned and present subtly insidious and invidious private and public racial discrimination against Black people as a class, a school environment which for whatever reason involves marked, disproportionate racial concentration inherently generates acute consciousness of race. As situated in segregated surroundings, this inflated consciousness triggers artificial, unrealistic personal reactions based on misconceived but, in view of historical predicates, *understandable individual perceptions of the significance of racial differences.*

Although disproportionate racial concentration of Black children in the schools might not have adverse consequences in all times and places, it certainly does in the context of the present forms of social organization, which are conditioned by legacy of slavery. One of the adverse effects of racial segregation is in the area of individual achievement.

Segregated Black children tend to infer that they are isolated from the White majority because of their race, and, drawing on their observations of the deprivations experienced by Black adults, they also tend to infer that their own potential is limited because of their race. It is not surprising that Black children have evidenced reduced self-esteem in a segregated environment and concomitant diminished motivation to succeed. The culturally-induced lack of self-esteem and diminished motivation in turn operate to measurably reduce achievement.

Individual growth in the educational system occurs not only in the area of achievement, the acquisition of cognitive skills, but also in the areas of social and psychological development. Segregation is perhaps more detrimental to the Black student's social and psychological development than to his achievement level. Finding himself isolated to a significant degree from the bulk of the White population, witnessing the dispa-

**2.** At 530–531 (1944).

rate superiority of the status of White adults over Black adults in many circumstances, and perhaps further observing a pronounced underrepresentation of Blacks in positions of leadership in his school, where this is the case, the Black child may become reluctant to assert himself in the presence of Whites and unduly pessimistic concerning his ability to interact or compete successfully with Whites of his own generation.[3]

Teacher reaction to segregated educational circumstances frequently operates to the disadvantage of students. Dubbed by some researchers as a kind of "self-fulfilling prophecy," the impact on Black students of teacher expectations based on race has been demonstrated by several studies. Affected by racial stereotypes as well as by actual patterns of disparate Black-White performance levels in the general society, teachers may tend to "teach down" to Black children, expecting and therefore eliciting low levels of performance.

The negative impact of racially segregated schools is not confined exclusively to Black students. White students may also react to racial isolation in ways harmful to themselves. White pupils are apt to form an irrational attitude of *inherent superiority and are apt to develop an unrealistic concept of homogeneous society in which certain values enjoy universal acceptance.* Similarly, because of their cultural isolation, segregated White children tend *to lose sight of those fundamental values of our constitutional system which, while respecting individual differences, favor free access and wide social mobility to all persons regardless of race, creed, or national origin, and which thereby promote a healthy interchange among persons of different backgrounds.*

The state of mind fostered by racial and cultural isolation heightens racial conflicts and divisiveness in the country and thus adversely affects the domestic tranquility the Constitution was designed to promote. White students who have been educated in segregated public schools are thus ill-prepared to deal with the pluralistic society which actually exists in the adult world beyond the classroom.

In part because of segregated schools, as Charles E. Silberman has written:

"[T]he public schools are failing dismally in what has always been regarded as one of their primary tasks—in Horace Mann's phrase, to be '*the great equalizer of the conditions of men,*' facilitating the movement of the poor and disadvantaged into the mainstream of American economic and social life. Far from being 'the great equalizer,' the schools help perpetuate the differences in conditions, or at the very least, do little to reduce them. *If the United States is to become a truly just and humane society, the schools will have to do an incomparably better job than they are now doing of educating youngsters from minority-group and lower-class homes*".[4] (Emphasis supplied.)

The subject of race in America and the consequences of racial segregation in the schools might be explored at much greater length. However, it clearly appears that in the context of modern America, segregated education is detrimental to both Black and White students, creating, especially for Black students, psychological and social difficulties which have a substantial adverse impact on overall individual development. Segregated education plainly denies equal educational opportunity.

The findings made by the court in this case parallel those made by the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [*Brown I*]. In addressing the precise issue of the effect of racial separation on grade and high school students the Supreme Court in *Brown* quoted

**3.** 1 U.S. Commission on Civil Rights, *Racial Isolation in the Public Schools* 114 (1967).

**4.** Quoted in Senate Select Committee on Equal Educational Opportunity, Toward Equal Educational Opportunity, Sen.Rep. No. 92–000, 92nd Cong., 2d Sess., Part III. Inequality in Education 95 (1972).

with approval language from the District Court as follows:

> " 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." 347 U.S. at 494, 74 S.Ct. at 691. (Emphasis supplied.)

Although much may be said about the fact that *Brown* involved obvious and conspicuous state action separating Blacks and Whites by statute, with respect to the simple issue of whether racial separation fundamentally poses a situation of inequity, *Brown* was and is unequivocal. "Separate educational facilities are inherently unequal." 347 U.S. at 495, 74 S.Ct. at 692.

## II.

The Fourteenth Amendment of the United States Constitution declares, "No State *shall . . . deny* to any person within its jurisdiction the equal protection of the laws." [5] The law is clear that official action at any hierarchial level which denies the plaintiffs equal protection of the laws is unconstitutional. *Ex parte Virginia*, 100 U.S. 339, 346–347, 25 L.Ed. 676 (1880). It is established that "under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience." [6] Members of local school boards as well as members of the State Board of Education and the Superintendent of Public

Instruction are State officers, agents of the State in every official respect.

Before entering upon the duties of their respective offices, all are required by the Michigan Constitution of 1963, Art. II, Sec. 1, to take and subscribe to the following oath or affirmation: "I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of . . according to the best of my ability." Each officer thus undertakes a personal and official responsibility to abide by the Constitution of the United States and of Michigan.

The principal issue in this case is whether the defendant State officers have denied the plaintiffs equal protection of the laws.

The Fifth Circuit, which has a vast experience with school desegregation cases, recently rejected "the anodyne dichotomy of classical de facto and de jure segregation." *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142, 148 (5 Cir. 1972). That court held that a finding of unlawful segregation would be supported by two distinct factual determinations. "First, a denial of equal educational opportunity must be found to exist, defined as racial or ethnic segregation. Secondly, this segregation must be the result of state action." While the specific quantity of state action and the severity of the segregation necessary to sustain a constitutional violation was left to be dealt with on a case by case basis, the court noted that, as a general rule, it "need only find a real and significant relationship, in terms of cause and effect, between state action and the denial of educational opportunity occasioned by the racial and ethnic separation of public school students." Id. See Appendix C.

However, the Supreme Court, in *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), *assumed* for the purposes of that case that a finding of de

---

**5.** Pertinent excerpts from Supreme Court cases interpreting the Fourteenth Amendment are included in Appendices. App. A.

**6.** *Bradley v. Milliken*, 484 F.2d 215 (6th Cir., 1973) (en banc). The analysis of State law concerning education in Michigan at 245–249, is adopted and incorporated by reference for the purposes of this opinion. App. B.

jure segregation was required to support a finding of a constitutional violation. This court follows the Supreme Court for the purposes of the present case, and, like the Supreme Court, leaves for further adjudication in other cases the question of whether something other than de jure segregation constitutes a violation of the Fourteenth Amendment.

As a first step toward resolving this issue, the court has had to ascertain the legal standards to be applied to determine whether the defendants have been guilty of de jure segregation.[7] Although not as fully refined as the common law torts, the major legal elements and conditioning factors of the constitutional tort of de jure segregation [8] are reasonably clear.

"A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools." Oliver, supra, footnote, 508 F.2d at 182.

■ Ascertaining the Board's intentions is certainly difficult, but it is not at all impossible. The starting place is the standards and processes evolved by the common law for determining the relevant state of mind of the defendant, or defendants, in an intentional tort suit. The Supreme Court and the Sixth Circuit Court of Appeals have said that one of the Congressional statutes relied upon by the plaintiffs in this case, 42 U.S.C. Section 1983, should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961); *Pierson v. Ray*, 386 U.S. 547, 556, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Puckett v. Cox*, 456 F.2d 233, 235 (6th Cir. 1972); see *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir. 1972). In general, it is reasonable to infer that people intend the natural and probable consequences of acts knowingly done or knowingly omitted. Thus, in a case tried to a jury, it would be proper to instruct that:

"In the absence of evidence in the case which leads the jury to a different or contrary conclusion, you may draw the inference and find that any person involved intended such natural and probable consequences as one standing in like circumstances, and possessing like knowledge, should reasonably have expected to result from any act knowingly done, or knowingly omitted, by such person. An act, or failure to act, is knowingly done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." [9]

Since intent may be proved by direct, indirect or circumstantial evidence, all the facts and circumstances in evidence in the case which may aid in the determination of state of mind may be considered.[10]

In the recent case of *Bronson v. Board of Education*, 6 Cir., 525 F.2d 344, the Sixth Circuit confirmed the course set in *Oliver* and further elucidated the meaning of the intent requirement.

"In *Keyes*, the Court emphasized that the 'differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate.' 413 U.S. at 208, 93

---

**7.** The analysis of the court in this regard closely parallels its previous treatment of the issue in *Oliver v. Kalamazoo Board of Education*, 368 F.Supp. 143 (D.C.Mich.1973); aff'd. sub nom. *Oliver v. Michigan State Board of Education*, 508 F.2d 178 (6 Cir. 1974), cert. denied 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

**8.** While the substantive requirements of the constitutional tort are derived from the Fourteenth Amendment and to a lesser extent from various implementation of statutes, this court has jurisdiction by virtue of several jurisdictional statutes passed by Congress.

**9.** 2 Devitt and Blackmar, Federal Jury Practice and Instructions, note 16 at Sec. 74.03. The term "other innocent reason" at the end of the final sentence refers in this context not to defenses in the area of causation or to such affirmative defenses as consent or self-defense, but rather refers to matters analogous to mistake or accident which would tend to negate knowledge or affirmative purpose.

**10.** Id.

S.Ct. [2686] at 2697. (emphasis in original). . . . (T)he Supreme Court appears to have held that intent is synonymous with purpose in determining whether a racial imbalance which is found to exist in a school system that was never segregated by state law results in a constitutional violation. In a school system which was previously segregated by state law there is no requirement that intent be shown. The state action requirement of the Fourteenth Amendment is not an issue. On the other hand, in a school system which has never been operated under a state requirement of separation of the races, *de facto* segregation may only be treated as resulting from state action in violation of the Fourteenth Amendment if it is shown to result from intentional acts, omission or policies of public officials or public bodies. . . .

"(A) court may infer intent, which is a subjective fact not easily proven, from evidence of racial imbalance accompanied by acts or omissions of a school board, the natural and probable result of which is to produce or perpetuate a segregated school system." (Citing *Oliver*, supra, and *Berry v. Benton Harbor School District*, 505 F.2d 238 (6 Cir. 1975)). *Bronson*, p. 348.

Under *Keyes*, in an intentional case, to be guilty of a constitutional violation, the state and/or local authorities must have in fact caused or maintained the segregated conditions which are complained of. Under this theory, it is a complete defense that the authorities have not at all caused or maintained, these conditions. Similarly, the defendants will not be held legally responsible if they have only occasionally committed segregative acts and these acts are of trivial importance and bear no significant relation to the modern situation.

■ Rather, the standard must be that the defendants to a substantial degree contributed to the creation or maintenance of segregated schooling in Lansing. In a tort case, it would be proper to instruct the jury

on the issue of proximate cause as follows: "An injury or damage is proximately caused by an act or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission." [11]

It is useful to note, as the Sixth Circuit did in *Oliver*, supra, at 182–183, that "(w)hen constitutional rights are involved, the issue is seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive citizens of the equal protection of the laws. Rather, under the test for de jure segregation, the question is whether a purposeful pattern of segregation has manifested itself over time, despite the fact that individual official actions, considered alone, may not have been taken for segregative purposes and may not have been in themselves constitutionally invalid. *Davis v. School District of Pontiac*, 443 F.2d 573, 576 (6th Cir., cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971)). Benevolence of motives does not excuse segregative acts. As the Supreme Court stated in *Wright v. Council of City of Emporia*, 407 U.S. 451, 461, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972), 'The "dominant purpose" test finds no precedent in our decisions. . . . The existence of a permissible purpose cannot sustain an action that has an impermissible effect.'"

In a similar vein, the Second Circuit has observed:

". . . (W)e believe that a finding of de jure segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. * * *

"To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible

11. 2 Devitt and Blackmar, supra, Sec. 73.18 (2d ed. 1970). Of course, there might be more than

one "proximate cause." See proposed jury instruction, Id. at Sec. 73.19.

of proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. See *Palmer v. Thompson*, 403 U.S. 217, 224–25, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); and see *Keyes v. School District No. 1*, supra, 413 U.S. at 233–34, 93 S.Ct. 2686 (Powell, J., concurring). It is even harder to find the motivation of local citizens, many of whom *would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor.*

\* \* \* \* \* \*

"Speaking in de jure terms does not require us, then, to *limit the state activity which effectively spells segregation only to acts which are provably motivated by a desire to discriminate.* \* \* \* Aside from the difficulties of ferreting out a collective motive and conversely the injustice of ascribing collective will to articulate remarks of particular bigots, *the nature of the 'state action' takes its quality from its foreseeable effect. The Fourteenth Amendment is not meant to assess blame but to prevent injustice."* (Emphasis supplied.) *Hart v. Community School Board of Education, N. Y. School Dist. No. 21*, 512 F.2d 37 (2nd Cir. 1975), cited in *U. S. v. School District of Omaha*, 521 F.2d 530 (8th Cir., 1975).

Cf. *Oliver*, supra.

In order to fairly assess the alleged actions and inactions of the defendants, and to determine what the foreseeable consequences of these acts and omissions were, it is necessary to consider the conditions existing when they occurred. To this end, the court has carefully evaluated all of the voluminous testimony and numerous exhibits put into evidence in this case since it began.

For purposes of this opinion, the court need comprehensively review only those developments in Lansing public education which have taken place since the middle 1950's, with special attention to the elementary schools. The most significant develop- ments have involved the growth of a pronounced racial concentration in some West Side elementary schools, the growth of a pronounced ethnic concentration in the north-central section of the city, and the varied responses of the Lansing Board of Education to these disturbing situations.

In particular the court has focused its attention on a number of acts and policies of the school board said by the plaintiffs to be evidence of de jure segregation. Chief among these are the rescission of the "cluster plan" for desegregating elementary schools, adopted by the Board on June 29, 1972, and the location and intended use of the new Vivian Riddle Elementary School, which is presently under construction. Other policies scrutinized by the court include those relating to mobile units, medical transfers, attendance boundaries, faculty hiring and assignment, physical facilities, and racial integration efforts involving transportation primarily of black children.

The Supreme Court in *Keyes*, supra, 413 U.S. at 196, 93 S.Ct. at 2691, stated: "What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of the faculty and staff and the community and administration attitudes toward the school, must be taken into consideration." Previously the Court wrote:

"In *Green* [*Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)], we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435, [88 S.Ct. 1689, at 1692] Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of

substantive constitutional rights under the Equal Protection Clause is shown." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554.

Based on the extensive evidence adduced at the preliminary injunction hearing, the court ruled before trial that such a prima facie showing had been made in this case, and that defendants would therefore carry the burden of going forward at trial. This shifting of the burden upon a presentation of a prima facie case is commonplace judicial procedure, and its application in school desegregation cases is not novel.[12]

■ A presumption of segregative intent arises when plaintiffs establish that the natural, probable and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies. *Oliver,* supra, 508 F.2d at 182; *Keyes,* supra; *Bradley v. Milliken,* 484 F.2d 215 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Davis v. School District of Pontiac,* 443 F.2d 573 (6th Cir. 1971), aff'g. 309 F.Supp. 734 (E.D.Mich. 1970).

The plaintiffs early in these proceedings established a prima facie case that the defendants maintained policies and were responsible for acts and omissions which did have the natural foreseeable, probable and actual effects of contributing to and continuing segregative conditions in Lansing elementary schools. Defendants have argued that the racial imbalance in Lansing elementary schools, and many of the acts and omissions plaintiffs complain of, are the result of a neighborhood school policy, consistently administered without regard to race.

However, the Supreme Court has made clear that facially neutral practices, even those neutral in terms of "intent," may be illegally discriminatory in effect. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Thus, this court has analyzed the evidence in this case to determine the foreseeable effects of the defendants' actions, as well as their motivations.

### III.

This court finds the following facts and circumstances.

The Lansing School District was organized in 1847 by the merger of three districts serving "upper, middle, and lower" towns in what was to become the City of Lansing. The City of Lansing and the school district expanded slowly and in 1949 had an area of about 11 square miles.

Between 1958 and 1965 the Lansing School District grew rapidly, as part or all of 12 neighboring school districts were annexed. The size of the District increased so that presently it is approximately 50 square miles, much larger than the city proper.

The Black population of Lansing likewise grew in the '50's, though not quite as dramatically. In 1950, Black people in Lansing numbered only 2,979 out of a total population of 92,129, or a little over 3%. By 1960, the proportion had changed to 6,745 Blacks out of a total of 107,807, or slightly over 6%.

Most Blacks lived on the West Side of Lansing, in the southern part of what is commonly known as the "River Island

---

12. "This burden-shifting principle is not new or novel. There are no hard-and-fast standards governing allocation of the burden of proof in every situation. The issue, rather, 'is merely a question of policy and fairness based on experience in the different situations.' 9 J. Wigmore, Evidence § 2486, at 275 (3d ed.1940). In the context of racial segregation in public education, the courts, including this Court, have recognized a variety of situations in which 'fairness' and 'policy' require state authorities to bear the burden of explaining actions or conditions which appear to be racially motivated. (Citation of cases omitted.)" Keyes, supra, 413 U.S. at 209, 93 S.Ct. at 2698.

area."[13] Following a familiar demographic pattern, Black people in the 1950's moved into previously white neighborhoods in the West Side section, and the racial composition of elementary schools changed accordingly.

*Attendance Zone Boundaries*

One such school which was affected in this fashion was Main Street. In September 1956, the school was slightly overcrowded and 62% Black. At that time, the overcrowding was eliminated and the proportion of Blacks was reduced to 55% by an adjustment of boundaries which took a two-block area from the Main attendance zone and gave students living in that area the option of attending either Kalamazoo or Lincoln school.[14] However, Blacks continued to move into the Main Street School service area, and the number of Blacks in the school continued to increase.

The Board of Education said it "considered that the trend of an increasing ratio of Negro to White enrollment at the Main Street School could develop into complete segregation, a situation not conducive to satisfactory race relations."[15] In 1957, confessing that its original attempt to reverse this trend toward a segregated school had failed, the Board appointed a committee in response to a request by parents, to analyze the conditions and recommend corrective measures. Among other things this committee suggested an additional boundary change, or, alternatively, the immediate construction of an elementary school in the

Heatherwood area to the northwest of Main Street School. The Board rejected the proposed boundary change for the reason discussed below. The Board also refused to construct a new elementary school since this would, in its view, require the vacating of satisfactory facilities and postpone the construction of new schools badly needed elsewhere. Finally concluding that the increased Black enrollment at Main was the result of Blacks moving into the service area, the Board resolved to abandon further efforts to keep Main integrated, and further resolved to maintain equal educational opportunity through a variety of special programs.[16]

The stated reason for the Board's refusal to change boundaries as its committee recommended was that such alterations "cannot accomplish any material results unless some children travel unreasonably long distances, in some cases completely across a school district and into the district of a distant school."[17]

Re-examination of this statement in light of the geographical realities is revealing. The school district which students would have had to go "completely across" to get into the "distant" district was a two-block wide strip of the Michigan service area which extends between Verlinden and Main, and is the site of Sexton High School. Of course, any students switched from the Verlinden to the Main area would have had to walk more than two blocks to actually get to school, but the map clearly shows

**13.** The term "River Island area" is used interchangeably in this opinion with "the West Side" to denote the area bounded on three sides by the Grand River and on the west side by the city limits and school district boundary. The name "River Island" was coined by a school administrator seeking to avoid untoward connotations from "West Side Story." It is by no means an island, geographically isolated from other parts of the school district. To the contrary, it comprises the city's Central Business District and the state capitol, and is readily accessible from all other parts of the city. The parties have not suggested that it is a "separate, identifiable, and unrelated section of the school district," *Keyes v. School District No. 1*, 413 U.S. at 205, 93 S.Ct. at 2696, and the

court finds on the evidence that it is not. On the basis of its examination of maps, verbal testimony and census and other demographic data, this court finds that Lansing School District, for purposes of this case, is to be treated as a single, undivided district.

**14.** "Boundary Changes, 1947–76," Def. Ex. 84.

**15.** Lansing Board of Education, Minutes, March 28, 1957, Pl. Ex. 12.

**16.** Id.

**17.** Id.

that over one-third of the Verlinden service area is within a mile of the Main Street schoolhouse door. (Def. Ex. 82.) Lansing School District's policy is that students are close enough to walk to school unless they live over a mile and a half from school.

Indeed, a request that same year from White Main Street parents who wanted the board to change boundaries so their children could go to White Verlinden School instead of Black Main Street School, shows that parents did not consider the distance unreasonably great. It also shows that they did not consider the high school campus a barrier to their access to the elementary school on the far side of it.[18]

This request by White parents that the boundary lines be gerrymandered to allow their children to go to the White Verlinden School was presented to the Board at about the same time as a related request by Black parents that the Board change boundaries to reduce concentration of Black students at Main. The Board asked representatives of Blacks and Whites to work together to resolve their differences, and after a less than cooperative beginning, they finally did so.[19] As noted above, no boundary changes were made by the Board at that time in response to these requests. In fact, since 1957, the Board has never altered the boundaries of the Main Street School service area,[20] although the 1966 Citizens' Advisory Committee recommended that boundary changes might be appropriate.[21]

The Board's prediction about the trend toward complete segregation was borne out, as Main Street eventually became over 90% Black.[22]

In September 1957, the Board altered the boundary lines among Michigan and Verlinden and Kalamazoo by removing three blocks (two of which were residential) from Michigan and making them part of Verlinden, and transferring roughly the same size area from Kalamazoo to Michigan. The area transferred from Michigan to Verlinden was all-White; there were no minority residents living there at the time.[23]

The reason for the alteration is not entirely clear—it was stipulated that if Lansing School District Information Services Director John Maars had testified, he would have stated that it was overcrowding at Kalamazoo Street School. Exhibit 84, "Boundary Changes," prepared by the school administration at the court's request, indicates that the reason was "to balance enrollments" among Michigan, Verlinden, and Kalamazoo. The difference in the choice of terms appears to have some significance, since Exhibit 84, which outlines and states reasons for all boundary changes in the district since 1948, distinguishes between changes to relieve overcrowding, and changes to balance enrollments. Indeed, it appears from looking at the whole transaction that if one of these three schools whose enrollments were balanced was overcrowded, it was Kalamazoo. This, because while Michigan gave up area to Verlinden, it simultaneously took on territory from Kalamazoo.

The view from the perspective of the Michigan Street School alone is puzzling, if not suggestive. Michigan had a capacity larger than the other schools involved.[24] For the year 1957–58, and for a number of years before and after that, Michigan's enrollment was significantly below capacity. Yet in 1957 the Board removed an all-White area from this school zone to already White Verlinden, with no apparent net change in the total size of the Michigan service area. (Michigan and Verlinden schools are about

18. The court also observes from the maps in evidence that there are routes on regular city streets between the two service areas, which do not cut through the high school grounds, and which would appear to be the most natural way to traverse the area.

19. Testimony of Clarence Rosa, Tr. 65–66.

20. Def. Ex. 84; Additional Stipulations, No. 4.

21. Pl. Ex. 5, p. 10.

22. Testimony of William L. Webb, Tr. 146.

23. Stipulation in open court, 10–20–75; Answer to Interrogatory 1(b)(2).

24. "1968 Facility Planning Study," Pl. Ex. 38; Def. Ex. 82.

equidistant from the area in question; Michigan is slightly closer.)

The Verlinden service area at this time had almost no Blacks. In 1950 it was virtually all White, and by 1960, it was still nearly 99% White. (Def. Ex. 24A, B.) The Michigan service area on the other hand, was overwhelmingly White in 1950, but by 1960 had a substantial number of Black residents. And Kalamazoo, already in 1950, was one of the two schools in the most heavily Black portion of the city (the other being Main). The court finds that a significant and growing number of Blacks resided in the Michigan attendance area at this time, and that the trend was evident by the late 1950's, as the boundary changes in question were being discussed or taking place. Dr. Remick testified that using census data his office could have predicted these trends based on the northward migration of Lansing's Black population, but no analysis was done. The effects of these population shifts on the school areas involved if not obvious were at least foreseeable.

Considered in this context then, it appears that the boundary changes in 1957 "to balance enrollment" among the three schools had at least two important consequences. First, it removed an entirely White area from Michigan, which had a substantial and growing number of Blacks, and placed it in Verlinden, which had always been, and remained at that time, nearly all White. Second, while taking this White area from Michigan the Board simultaneously added to Michigan an area from a substantially Black school service zone.

Attendance zone alterations which have the effect of exacerbating racial imbalance and isolation have been found in numerous cases to be indicia of segregative intent. See *Oliver,* supra; *Bradley v. Milliken,* supra, 484 F.2d at 221–236; *Davis v. School District of Pontiac,* supra, 443 F.2d at 576;

*Keyes,* supra, 10 Cir., 445 F.2d 990, 1001; *United States v. Board of School Commissioners of Indianapolis,* 474 F.2d 81, 85–86 (7th Cir.), cert. denied 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

After 1957, the Board made no changes in the boundaries of Main Street School.[25] Subsequently, in the early 1960's, Main Street School again became overcrowded, and two mobile units were placed there.[26] During the time mobile units were used at Main, some space was available at Verlinden, but no boundary changes were made. (The use of mobile units is discussed in greater detail below.) Between 1957 and 1972, a number of committees and study groups recommended to the Board that boundary changes be made to rectify racial imbalances, but it does not appear from the record that any such changes were made.

The rigidification of attendance zone boundaries around schools attended by the majority of Black students had the predictable and actual effect of "cementing" Black students into special areas and particular schools within those areas, and of preserving many other areas and schools for Whites. *Oliver v. Kalamazoo Board of Education,* supra, at 166, aff'd., *Oliver v. Michigan State Board of Education,* supra, at 183–84.

Related to this is the fact that between 1949 and 1965 there were 18 separate annexations of neighboring school districts by the Lansing School District. Def. Ex. 79A, B. Many of these annexed districts brought with them buses which they had been using, and continued to use, for transportation of their pupils to and from school. Def. Ex. 83. Each of these annexations presented the Board with an affirmative opportunity to re-examine the attendance zone boundaries of the district, and to work toward racial integration. Instead, in each instance, the Board chose neither to reorganize service areas nor to initiate any other

---

**25.** Def. Ex. 84; Additional Stipulations, No. 4. A map showing River Island attendance areas is in West Side Educational Facilities Ad Hoc Committee, "Report and Recommendations on River Island Elementary Schools, February 24, 1972," App. III–F, Addendum No. 1, Pl. Ex. 6.

**26.** "Mobile Unit Locations—Historical Record 1962–1973." Def. Ex. 16.

action which would have minimized discriminatory racial isolation.

Too often, public officials act routinely on such matters, ignoring alternatives and failing to consider the natural and foreseeable consequences of their actions. While each annexation or similar agenda item has peculiar significance for a specific area or group of people, the school board has responsibility for and control over the entire district. It cannot be myopic. In order to discharge their obligations properly, school board members must look at the implications of each decision they make, in light of the best interest of the total district. Local school boards throughout the country have been on notice at least since the Brown decision in 1954 that they have a duty to eradicate discriminatory racial isolation. This duty should be constantly on the minds of school board members as they decide questions like boundary changes through annexation, transfers to relieve overcrowding, and selection of new sites. The Michigan State Board of Education and Michigan Civil Rights Commission articulated this idea well in their Joint Policy Statement when they stated that "(e)ach of these situations presents an opportunity for integration." [27]

*Transfers*

■ As the Board abandoned efforts to keep Main Street School racially integrated through boundary adjustments, it established special transfer policies which further exacerbated the problem of racial isolation. A Student Transfer Policy was adopted by the Board of Education in 1957 which permitted students to transfer because of emotional need, based on a physician's statement. That policy, while neutral on its face, had the effect of accelerating the segregated nature of certain Lansing elementary schools. A policy which allows transfers from racial minority schools to racial majority schools, even when restricted, is tantamount to an authorization

for White students to flee and is a means for the perpetuation of segregation. *Davis v. Board of School Commissioners*, 414 F.2d 609 (5 Cir. 1969); *Monroe v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Goss v. Board of Education*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).

The policy was used by a large number of students to flee from predominantly Black Main and Michigan schools to Verlinden, a predominantly White school. A substantial number of those transferring were White students, though Whites made up a relatively small portion of the Main and Michigan student bodies.

The disproportionate use of this policy by White students, alleging emotional need to transfer into White schools, was widely recognized as an abusive practice. The Board of Education knew about misuse of the policy as early as 1961, when the Committee on School Needs, established by the Board, recommended that the transfer policy be changed, stating that "the school system, rather than contributing further to the problem of segregation, must make positive efforts towards ameliorating the situation." [28] Hortense Canady, who served on the Committee, testified that it was disturbed by the large number of transfers out of Black schools, and especially from Main Street School to predominantly White Verlinden, for purely racial or allegedly "medical" reasons. Both parties acknowledged that some special transfers also went from Michigan Avenue School, which was becoming predominantly Black in the early 1960's, to Verlinden. In its 1961 Report to the Board, the Citizens' Committee recommended that a policy be established which would "discourage" and prevent transfer for reasons of race, nationality, or religion." [29]

Since the Board keeps special transfer statistics for only five years, and for a time was precluded from keeping any statistics on the basis of race, the parties were unable

**27.** See pp. 616–617, infra.

**28.** Pl. Ex. 3, p. 17.

**29.** Id.

to present data on transfers for every year since 1957. However, stipulated evidence was presented to the court showing that in 1962–63, 20 White students and 5 Black students transferred into Verlinden. No other school had more than 3 students transferring into it that year. In 1963–64, 17 Whites transferred into Verlinden, in addition to 16 Black students, while the next highest number of transfers to any other school was 5. At that time, Main was 95% minority, Michigan 75% minority, and Verlinden was 6% minority. Between 1966 and 1973, 48 White and 125 Black students transferred into Verlinden. Thus for all the years for which statistics are available, 85 White and 146 Black students transferred into Verlinden.

These statistics do not tell the full story of the special transfers in the early 1960's. They do not show, for example, the service area from which the students transferred into Verlinden. However, testimonial and documentary evidence suggested that the White Verlinden transfers came primarily from the Main Street School service area, and exclusively from the Main Street and Michigan Avenue service areas combined.[30] The figures show that the policy was used by both Black and White students to leave the Black schools, and indeed there is testimony indicating that the policy was used by Black parents trying to get their children out of the segregated schools and into an integrated setting. Testimony elicited by the defense counsel, e. g., showed that at least one prominent member of the NAACP used the transfer policy to move his children to Verlinden.[31] While these figures might be construed as evidence of a neutral policy, when they are considered in the context of the racial compositions of the schools involved, it is clear that the policy had a significant differential impact. During the years at issue, Main Street School

was 95% Black, until 1969–70, and even then it was over 86% Black until the advent of the cluster program. In 1964, e. g., Main had only 20 nonminority students. Michigan Avenue school similarly was over 70% Black during the 1960's, and reached over 90% Black in the years immediately before the cluster program began. It had 93 non-minorities in 1964. So at a time when Main had 20 Whites, and the two Black schools together had 113, it is reasonable to infer that allowing 20 Whites to transfer in one year, and 17 in the next, had a significant impact on the racial makeup of these schools. In the three-year period between 1966 and 1969, a total of 31 White students attended Verlinden though they were non-residents of that attendance area; for these same three years combined, the total number of White students at Main was 24.[32] In 1967, when Main had only nine Whites out of 312 students, 13 Whites were allowed to transfer into Verlinden. Moreover, this occurred at a time when Verlinden was becoming overcrowded, according to William Webb, Director of Pupil Personnel for the Lansing School District. When the policy was temporarily changed in 1967, one of the reasons was that Verlinden was becoming overcrowded.[33]

The bare statistics likewise do not state *why* students were allowed to transfer in such relatively large numbers into Verlinden school. The Board's "Policy Statement No. 6121: Equal Educational Opportunity," adopted on June 4, 1964,[34] stated the following with respect to transfers: [35]

"The Board of Education recognizes that on occasion it has been necessary to deviate from the attendance-area concept and assign students to schools far removed from their homes. This has been done to eliminate overcrowding of certain schools. *In individual cases, a student*

30. Testimony of Hortense Canady and of William Webb at the July 1973 proceedings; "Report of the Education Committee of the Lansing Branch NAACP (1965)," Pl. Ex. 4.

31. Testimony of Vernon Ebersole, Tr. 561.

32. Def. Ex. 15; Pl. Ex. 66, 67.

33. Testimony of Webb, Tr. 125.

34. Reprinted in full in "Human Relations Report 1964," Pl. Ex. 21, at 5–8.

35. "Human Relations Report 1964," at 8.

*has been allowed to attend a school other than the one to which he normally would be assigned. Such transfers have been authorized only because of the particular, individual needs of the student—usually curricular needs—which one school is prepared to meet, another is not."* (Emphasis supplied.)

The suggestion was also made that each student was transferred for a bona fide "health" or "medical" reason.

The plaintiffs, in contrast, contend that *the Board's system of special transfers in* the Main-Michigan-Verlinden area amounted to a conscious departure from the neighborhood school policy in a situation where adherence to the policy would have produced a more even racial distribution among some schools, at least temporarily.

The testimony of the witnesses on this issue is particularly important, because of the gaps in the evidentiary data. There is no record, e. g., of how many transfers, or of what race, took place in the first five years under the policy. But there was enough activity during this time to prompt a committee appointed by the Board to recommend a change in the policy because of misuse. Likewise, there is another two-year gap in recordkeeping from 1964 to 1966, a significant period in light of the large number of Whites who had transferred in the preceding years. Again, a committee appointed by the Board and operating during the years for which there is now no concrete data, found the policy was being abused by White students fleeing Black schools on the pretext of "emotional need." The records that were kept showed only the receiving school, so again the testimony of witnesses was important in determining the actual effect of the policy on Black schools.

The 1961 report of the Committee on School Needs recommended that the policy be changed to require verification by a psychiatrist of the alleged emotional need. Kathryn Boucher, who headed the subcommittee which dealt with this question, and later became a school board member, testified that the recommendation was based on the members' knowledge of what types of youngsters were being transferred, and their belief that the policy was being abused.[36] Hortense Canady, who also served on the committee, testified that what prompted the recommendation in 1961 were "medical transfers of a various nature that tended to transfer students in whole-sale numbers from schools that were becoming more progressively Black in student body composition, and these students were being transferred to other schools that were predominantly White schools."[37] The Board, which had appointed the committee in 1959, received the report and was aware of its contents, but did not implement the recommended change.

In light of the Board's report in 1964 to the Lansing Human Relations Commission, incorporating Policy Statement No. 6121, set out above, the Board's knowledge of the abuse at that point in time might still be questioned. In that report, the board stated that "transfers have been authorized only because of the particular, individual needs of a student—usually curricular needs—which one school is prepared to meet, another is not." However, this report came at the end of a two-year period when 42% (58 of 139) of the transfers for the whole elementary school district were into one White school, Verlinden, from two Black schools, Main and Michigan. This either reflects adversely on the credibility of the Board's assertion, or indicates a significant disparity between the curricular programs of the White school and the Black schools.

At trial, the defendants did not attempt to justify the unusually large number of transfers to Verlinden as curricular. Moreover, the defendants have asked the court to make a finding that "the basic curriculum is the same throughout all of the elementary schools in Lansing School Dis-

---

**36.** Tr. 606, 609.

**37.** Transcript of July 17, 1973 proceedings, p. 19.

trict." [38] Weighing the credibility of the Board's assertion, in light of the 1961 report to the Board of abuses, and subsequent reports, as well as the testimony of witnesses, the court finds that nothing in the 1964 report negates the finding that the Board was aware of misuse of the transfer policy at that time.

In 1965, the Education Committee of the Lansing NAACP prepared and presented to the Board of Education a report which, inter alia, critically discussed the transfer practices, and made a finding that no action had been taken since the 1961 recommendation and that transfers were still being granted as in the past.

The next year, 1966, the Board received the report of the Citizens' Advisory Committee, which it had appointed in 1965. This report again put the Board on notice that the policy was being misused. The committee wrote in its report:

"The committee has investigated the use of medical permits obtained to enable a student from one school service area to attend another school. To the degree that medical certification is both easily obtained and uncritically accepted, the attendance area standards of the school system are being subverted.

"*The committee recommends* that the procedure for obtaining medical permits be revised to cope with those relatively few cases where sound reasons may dictate a change in school assignment for emotional reasons. *It recommends* that the Board of Education utilize the services of a clinical psychologist or psychiatrist as part of the evaluation procedure." [39] (Emphasis in original.)

Vernon Ebersole testified that he recalled, as a member of the Board, that the Citizens' Advisory Committee in 1966 condemned the transfer policy.

The court finds most persuasive the testimony of William Webb, who as Director of Pupil Personnel was the school administrator directly responsible for transfers for the past twelve years. He testified that at the time the 1966 report was submitted, it was his feeling that the transfer procedures were being misused, and that he conveyed this information to the Board. [40]

In January 1967, the Board finally changed the policy so that any transfer based on emotional instability would require verification of a psychiatrist. However, in June of that same year, the Board rescinded the new policy and substituted one allowing certification by either a physician or a psychiatrist—in effect, requiring only a medical doctor's approval, as before.

Finally, the suggestion was made that each transfer was for a bona fide "health" or "medical" reason which existed apart from the desire of some to escape from predominantly Black schools to a nearby White one. The problem with this explanation, in addition to its conflict with the evidence recounted above, is its inherent improbability. The court does not find credible the suggestion that relatively large numbers of White students had special health difficulties requiring them to attend Verlinden (20 in 1962–63, 17 in 1963–64), while the next highest school received only 3 special transfers in 1962–63 and 5 in 1963–64, nor that such reasons necessitated the transfer of 231 students into Verlinden in nine years.

The wide disparity between Verlinden and other schools suggests that the major reason for transferring to Verlinden was other than medical, and the statistics on the racial balance of Main, Michigan and Verlinden lend credibility to the charge that the transfers to Verlinden were racially motivated, and allowed with the factor of race principally in mind.

After carefully weighing the testimony of the witnesses, and evaluating the relevant exhibits, the court is convinced, and finds as a fact, that the transfer policy was abused in a way which contributed to the

**38.** Def. Proposed Findings of Fact, XII, p. 10.

**39.** Pl. Ex. 5, p. 16.

**40.** Tr. 134.

segregative conditions in these schools, and with the knowledge of school officials and the Board of Education.

The Board's intentional maintenance of the transfer policy, and its refusal to change it, had the clearly foreseeable effect of increasing racial identifiability of Main Street School, Michigan Avenue School, and Verlinden Street School.

In *Morgan v. Hennigan,* 379 F.Supp. 410 (D.Mass.) Judge Garrity considered the rescission by the school board of a resolution it had passed modifying a transfer policy. He found in that case, as the court does here, that "the 'neighborhood school' policy was subordinated to the white students' presumed right to escape to safely white out-of-district schools." 379 F.Supp. 410, 456 (D.Mass.1974).

*Mobile Units*

The school system's placement of some mobile units is further evidence of official action aggravating segregative conditions. Cf. *Keyes,* supra, 413 U.S. at 202, 93 S.Ct. 2686, and 445 F.2d at 1000–01. When Main Street School became overcrowded during the period of the late 1950's and early 1960's, the Board of Education could have made the decision to alter boundaries or transport students to other attendance areas to relieve the situation. Instead, in 1962, it added two mobile units at Main Street, thus contributing to and perpetuating the racial identifiability of that school, which was well over 50% Black.

During the time that the Board used mobile units at Main, nearby Verlinden Street School, in 1962–63, had only 330 students enrolled, but a capacity of 368. Also during the period when Main had mobile units, nearby Barnes, with a capacity of 456 had actual enrollments of 425 (1962–63), 396 (1963–64), and 409 (1964–65). Verlinden is about 14 blocks, slightly over a mile, north of Main Street School, and Barnes Avenue School is about 1.2 miles southeast of Verlinden. A study by the Education Committee of the Lansing NAACP showed, based on research by Dr. John Porter, now Superintendent of Public Instruction, that in 1962–63, Verlinden had two vacant classrooms, and Barnes had one vacant classroom.[41] Both Barnes and Verlinden were predominantly White at the time.

Either through boundary changes or transportation of students,[42] the school system could have utilized vacant spaces in either of these schools to simultaneously relieve overcrowding at Main and affirmatively enhance integration. But instead it chose to use mobile units, containing the Main Street School population on that campus, despite the objections of parents and community groups.[43] That transportation to relieve overcrowding and achieve integration was a viable alternative is demonstrated by the fact that as a result of community displeasure with the mobile units, some Main students were transported to Walnut beginning in the fall of 1964. (In fact, it appears that the Board considered transportation as an alternative be-

41. Pl. Ex. 4, p. 20.

42. The court notes that while Verlinden was within walking distance for a substantial number of Main Street area students, use of Barnes facilities probably would have required bus transportation because the Grand River runs between Main and Barnes.

43. Community opposition to the use of mobile units at Main was pronounced. After a meeting between the NAACP and the Main Street PTA in April 1963, the PTA appointed a committee to meet with the Board of Education to discourage additional use of mobile units at Main. It was not until Fall, 1964, that some students were transported to Walnut, and the mobile units were removed in the spring of

1965. A Citizens' Advisory Committee appointed by the Board of Education in 1965 also recommended that temporary units be removed from Main (Pl. Ex. 5, p. 27). Former board member Hortense Canady, who chaired the NAACP Education Committee, testified that that committee not only made its recommendation, but also circulated resolutions which were signed by citizens of the community, requesting that boundary changes, or some other method than continuing to overcrowd the Main campus, be adopted. (Transcript of July 1973 proceedings, p. 25.) Board member Vernon Ebersole also testified about objections voiced to the Board by some Main Street parents about the use of mobile units. (Tr. 508.)

fore it placed the mobile units.) [44] The use of Walnut also shows that the school board did not consider itself limited only to adjacent attendance areas when seeking to remedy overcrowded conditions in elementary schools.

*Physical Conditions and Facilities*

■ The maintenance of unequal facilities for Black and White students is another important indicium of de jure segregation. Cf. *Oliver v. Kalamazoo Board of Education,* supra, at 174–75; *Green,* supra, 391 U.S. at 435, 88 S.Ct. 1689.

Although Lansing elementary school facilities in general were adequately maintained, Michigan Avenue School was unquestionably an inferior facility, at least through the late 1960's and early 1970's. During this time it was predominantly Black. A deteriorating interior, coupled with a high pupil per acre ratio,[45] and overheating problems serious enough to affect student performance highlighted the inadequacies.

There was testimony that the main reason this building was not adequately maintained, and was allowed to deteriorate, was that the state had purchased or was about to purchase it. Since the school would then be replaced with a new facility, the school district wanted to make no major expenditures on the old building. Dennis Semrau testified that he was told when he became principal at Michigan in 1968 that the building would be used only three more years. It is still in use today, over seven years later; a whole K–6 generation of students has gone through the building since then.

The defendants have urged that the failure of the Board of Education to act decisively with respect to Michigan was due to uncertainties arising primarily from actions of state officials planning the capitol expansion and a possible state highway project involving Logan and Butler Streets. Whether school officials alone were responsible for the situation at Michigan School, or whether state officials contributed to the problem, it appears that the acts of public officials resulted in unequal facilities for this Black school. Many of the other conditions plaintiffs complain of were found in both Black and White schools, but the only school allowed to operate under the inferior physical conditions existing at Michigan was this one, a Black school.

Aside from the unequal conditions at Michigan Avenue School, the Lansing School District operated otherwise in a facially neutral manner with regard to facilities. Schools were (for the most part, but with important exceptions discussed elsewhere in this opinion) attended by children who lived within the service area, and there is no evidence that school officials were responsible for racially imbalanced residential patterns. The same schools now used primarily by minority students were once used by Whites. It appears that the buildings have been adequately and equally maintained throughout the district. Equipment and teaching materials at minority schools have been at least equal, and perhaps better, than those available at other schools, due to the effective use of federal funds. There are a few White schools with small site sizes, and schools with larger sites are primarily in outlying areas annexed after 1950.

However, these ameliorative factors do not change certain unfortunate realities concerning the minority schools. Heavily minority schools tend to have the smallest sites, with the largest number of pupils per acre of school area. As of 1972, the average acreage of school site areas was 8.2 acres for schools whose enrollments was between 0% to 10% minority, 5.4 acres for schools whose enrollment was between 11% and 31% minority, and 3.2 acres for schools whose enrollment was 32% to 100% minority. As of 1972, using figures which make allowance for kindergarten students attend-

---

**44.** Pl. Ex. 4, p. 19.

**45.** The size of the Michigan Avenue School site is 1.34 acres, smallest in the River Island Area, and fourth smallest of the 47 elementary schools in the district.

ing on a half-day basis, the average number of pupils per acre for schools with between 0% and 10% minority students was 54.99 pupils per acre, for schools between 11% and 31% minority, 91.09 pupils per acre, and for schools between 32% and 100% minority, 150.91 pupils per acre.[46]

Not surprisingly, corollary figures show that there is less average acreage of playground area at minority schools, and a greater number of pupils per acre of playground area. For example, in 1970, the mean number of pupils per acre of playground area for the district was about 125, while for Kalamazoo it was about 475.[47] The Lansing School District's 1968 Facility Planning Study listed a number of schools where "playground activities and physical education programs are extremely hindered by lack of playground areas." The list included all five schools with minority enrollments in excess of 40%—Allen, Cedar, Kalamazoo, Main, and Michigan.[48] (There was testimony that school officials tried to compensate for this problem through use of multi-purpose rooms and/or adjacent park areas, where available.)

Although school officials apparently maintained a racially neutral policy of adequately maintaining facilities throughout the district (with the noted exception of Michigan), the relative size and conditions of substantially minority schools nonetheless produced discriminatory effects because other discriminatory acts and omissions were predicated on them.

A specific example is the closing of Kalamazoo Street School. This facility was phased out gradually and finally closed in 1970, according to board members largely because of dwindling enrollments.[49] Yet there was no attempt made (from what appears in the record) to bring White students into Kalamazoo, filling classrooms and simultaneously integrating the school, despite the fact that when Kalamazoo was closed, its students were bused out to White schools. Thus it is clear that busing was not the impediment. If the problem was that school officials felt the Kalamazoo campus, because of lack of playground facilities or other inadequacies, was not good enough for continued use (not satisfactory for use by White students coming in), or at least that it was relatively less adequate than the White schools to which Kalamazoo area students were to be bused, then the discriminatory effect is clear. Kalamazoo area students were denied the right to attend their neighborhood school,[50] and had to bear the burden of one-way busing because their own school was inadequate. It has been previously noted that Kalamazoo had the highest ratio of pupils per acre of playground area. Much more significant is former board president Rosa's testimony that as Kalamazoo was phased out, the third floor was closed first, because it was considered a hazard.[51] If the Kalamazoo facilities were not considered inadequate and inferior, the failure of school officials to use that school rather than depend solely on

46. Stipulations filed October 15, 1975, Nos. 8, 9.

47. Pl. Ex. 45.

48. "1968 Facility Planning Study," Pl. Ex. 38, p. 36; "1968 Ethnic Count Report," Pl. Ex. 66.

49. Board member Vernon Ebersole, asked by defense counsel why he voted in 1969 to bus students from the Kalamazoo area, replied: "The school was losing their population over a period of time for the reasons I gave, the State Complex, the I–496 Complex, to the point where it was getting uneconomical to operate it with the number of youngsters who would be attending." Tr. 560.

See also, testimony of Ebersole, Tr. 519. Board member Joan Hess testified that at the time Kalamazoo was phased out, it was slowly losing most of its students because of the capitol complex, Oldsmobile expansion, and highway projects. Tr. 426.

50. Present Board member Joan Hess, not a member at the time Kalamazoo was phased out, arguing that children in that area should be allowed to attend their neighborhood school, stated: "Every time you remove a school from an area, you automatically condemn that particular area to deterioration, because you lose the young vital families moving in." Tr. 429.

51. Testimony of Clarence Rosa, Tr. 74.

one-way busing to achieve integration is all the more inexcusable.[52]

Similar circumstances surrounded the closing of Lincoln. Long a Black school, Lincoln suffered dwindling enrollment, due primarily to expansion of Oldsmobile operations and an interstate highway project, to the point that board members felt it was not economically feasible to keep it open.[53] It appears that these classroom vacancies also presented the Board with an opportunity for integration. The decision not to bring White students in, but to instead close the school, bus Black children out, and sell the building for demolition by Oldsmobile Corporation, could be interpreted as another indication of the relative inferiority of Black facilities.

The industrial and state and federal governmental expansion programs, of course, constituted a significant outside influence on Board actions in this regard, which should be noted. The programs of the state government—unquestionably acts of public officials—included most notably the state capitol expansion project, the construction of I–496, and plans by the highway department for development of Logan and Butler streets. The I–496 project, which had the most devastating impact on these neighborhoods, was also carried out through acts of federal government officials, with federal funds. Each of these activities had a significant impact on the demographics of the West Side Area, displacing many hundreds of families and altering the physical complexion of the community. It likewise had a major impact on the school system, contributing heavily to dwindling enrollment, leaving neighborhoods unsatisfactory for school facilities, and causing uncertainties which delayed essential school planning with concomitant perpetuation of inadequate conditions in at least one school. In addition to these state and federal government activities, there was also extensive encroachment by industrial and commercial developments in previously residential neighborhoods. Current and former board members testified that besides the primary influence of Oldsmobile Corporation expansion, there was also similar activity by other industries, including Industrial Welding, by businesses and professional offices, and by the Lansing Community College. While this activity was primarily the result of private sector decisions, the cooperation of public officials, at least with respect to zoning, was necessary for much of it. The West Side Educational Facilities Ad Hoc Committee, in its 1972 report to the Board, cited numerous zoning decisions contributing to the decline of available residential dwellings in some areas, particularly on the edges of the Central Business District, the Lansing Community College campus, and the Governmental Complex, and increasing population density in others.[54]

█ Thus, it is abundantly clear that government actions at all levels—federal, state and local—contributed significantly to conditions adversely affecting predominantly minority schools in the ways described above. The governmental authorities involved are liable for the consequences of their actions, which were readily foreseeable, and school officials are responsible for the foreseeable consequences of their omissions or commissions under the factual circumstances found in this opinion.

*Faculty Hiring and Assignment*

There is evidence that in the early 1950's at least, the hiring practices of the Lansing School District were racially discriminatory. Two women testified that they were initially told when they applied that the district either did not hire, or already had its quota of Blacks, although each was in fact hired in the year she applied. Olivia Letts had

---

**52.** The problem of one-way busing is discussed in more detail below, at pp. 67–71, *infra.*

**53.** See testimony of Kathryn Boucher, Tr. 612; see also, testimony of Clarence Rosa, Tr. 75–76, and Vernon Ebersole, Tr. 514–18.

**54.** Pl. Ex. 6, App. III–C.

taught three years elsewhere before applying to the Lansing School District in 1951. She testified that when she applied, she received a letter from then assistant superintendent, Dr. Forrest Averill, stating that the school system was not hiring Blacks as teachers. He told her, however, that they had contemplated hiring and were at that time looking for a secondary staff member, and that it would probably be only a matter of time before they would hire a Black elementary teacher. She was ultimately hired that year as the first Black elementary teacher in the district, and was assigned to Lincoln School, which was 99% Black. That same year, the district hired its first Black secondary school teacher.

The other woman, Jerusha Bonham, and her husband both applied in 1953. At that time she had a master's degree in elementary education, and had completed one term on a doctorate in elementary education. She testified she was told by Dr. Averill that although the district always needed elementary teachers (there were no secondary openings), it already had its quota of minority teachers for that year. She was in fact subsequently hired, and began teaching in September 1953. Her husband, after working as a bricklayer on the construction of the Frandor Shopping Center, was hired to teach beginning in 1954.

Former Board president Clarence Rosa, who served on the Board from 1957 to 1972, testified that he had heard of a quota hiring policy before he came to the Board, but that he knew of no evidence of one after he became a member.

Subsequently, the Lansing School District began hiring more minority personnel, including Spanish-Americans in addition to Blacks, but the District has not hired the same proportion of minority personnel as the proportion of minority students.[55] The following chart illustrates this fact:

PERCENTAGE OF MINORITY PERSONNEL AND MINORITY STUDENTS [56]

| Year | Minority * Personnel ** | Percent of Total Personnel | Percent Minority Students |
|------|------------------------|----------------------------|---------------------------|
| 1967–68 | 66 | 3.8% | 14% |
| 1968–69 | 70 | 4.2% | 15.3% |
| 1969–70 | 92 | 5.1% | 16.7% |
| 1970–71 | 130 | 7.9% | 18.7% |
| 1971–72 | 154 | 9.2% | 20.4% |

\* "Minority" includes Black and Spanish-American.
\*\* "Personnel" includes certificated Administrators, Coodinators, and Elementary and Secondary School Teachers.

There is testimony that the Lansing School District actively recruited in good faith around the country, seeking minority applicants for teaching positions. These efforts met with uneven success, but eventually paid off, and it appears that there is at present no discrimination in the hiring practices of the District.

But as racially discriminatory hiring practices were eliminated, another troublesome situation developed. A number of Lansing elementary schools were or were becoming racially identifiable. There is evidence that minority teachers were disproportionately assigned to those schools which were predominantly Black. Such a practice has been found in numerous cases to be important evidence of segregative intent. *Swann*, supra, 402 U.S. at 18, 91 S.Ct. 1267; *Keyes*, supra, 413 U.S. at 196, 93 S.Ct. 2686; *Oliver v. Kalamazoo Board of Education*, supra, at 176–78, aff'd, *Oliver v. Michigan*

55. Additional Stipulations, No. 12.

56. From "In-Service Training Manual," Pl. Ex. 9, and testimony of Mr. Dwayne Wilson, Advisory Specialist for Equal Educational Opportunity, Lansing School District.

*State Board of Education,* supra, at 185; *Berry v. School District of Benton Harbor,* 505 F.2d 238, 240–42 (6th Cir. 1974); *Morgan v. Hennigan,* supra, at 456–61.

At least one Citizens' Committee communicated to the Board the importance of distributing minority teachers throughout the schools of the District, and the school system officially had a policy of doing so. Nonetheless, the evidence shows that Lincoln, e. g., which had been overwhelmingly Black since at least 1950, and had been assigned the District's first Black teacher and first Black principal, had a staff which was 50% Black (the principal and 3 of 7 teachers) when it was closed in 1965. At predominantly Black Michigan Avenue School, 3 of 14 teachers were Black in 1968, 4 of 13 in 1969, and 5 of 13 in 1970 and 1971.[57]

It was stipulated that "the Board of Education has exercised a policy of assigning Black teachers to predominantly Black Schools, disproportionately, with the two remaining Black Schools, Main and Michigan, having 33% and 46% minority teachers, respectively.[58] In January of 1972, 7 elementary schools which had 10% or less minority student enrollment had no minority teachers at all.[59] Thus, in the absence of an explanation from the Board for these differences, it appears probable that the Board has to a significant degree discriminatorily assigned minority teachers to minority schools.

Conceding some instances of disproportionate assignment, defendants argue that "one reason for the assignment of Black teachers to Black schools was to 'bring about a better kind of communication pattern.'"[60] The defendants also argue that the teachers were well qualified and that there was community support for the practice. The court does not question the quality of the teachers involved,[61] nor does it deny the possible benefits in a relationship between Black teachers and Black students. But as then District Judge Albert Engel (now on the Sixth Circuit Court of Appeals) stated in *Higgins v. Board of Education of Grand Rapids,* 395 F.Supp. 444 (W.D.Mich.):

"A disproportionate percentage of black faculty, it is agreed, tends to racially identify the school in the perceptions of its own students, of the students in 'white' schools, and of the public. Conversely, it is recognized that a racially balanced faculty has great benefit by improving the perception of the white community of the capabilities and achievements of blacks in a pluralistic society." 395 F.Supp. 444, 478 (1973).

■ The efficacy of assigning Black teachers disproportionately to a particular school for purposes of their relationship with Black students assumes the continued existence of racially identifiable schools. It is an indicium of intent to maintain the

---

57. Plaintiffs urge the court to find that assignment of professional staff personnel as a whole, including in addition to teaching staffs, principals, librarians, counselors, social workers, nurses and community coordinators, was also racially disproportionate. While it appears that schools with larger Black enrollments also had larger than average percentages of Black professional staff, the evidence is inconclusive. Exhibit 37 shows that the mean for the District for percentage of professional personnel from minority groups was 4%, while Michigan, a 93% Black school had 24%. However the statistics are inconclusive overall. The next highest was 15% at Willow, which had 34% minority student population. Kalamazoo, with 89% minority students, had 8% minority staff, while Horsebrook, with 1% minority students, had 10% minority staff.

58. Additional Stipulations, No. 13.

59. Testimony of Mr. Dwayne Wilson; "In-Service Training."

60. Def. Proposed Findings of Fact, No. XI, p. 9.

61. Plaintiffs have introduced evidence comparing the average number of years of teaching experience for teachers in schools with significant minority enrollments and other schools throughout the district. The court is unwilling to draw any conclusions from these statistics, particularly in light of considerable testimony indicating the competence of teachers in these minority schools.

facility as a racially identifiable school, and the practice itself helps make a given school racially identifiable. Though there is some evidence that the Board' has attempted to obtain a more neutral distribution of Black teachers throughout the District in recent years, it remains a fact that the school district has in the past knowingly maintained racially disproportionate staffs at Black schools. The court finds that this has had the effect of increasing and perpetuating the racial identifiability of the schools in question, and that this effect was a natural and foreseeable consequence of the policy.

### IV.

The Lansing Board was in the middle 1960's becoming increasingly conscious of the severe racial concentration which existed in several elementary schools. In 1964, Lansing had 16,654 elementary students in 39 elementary schools. Of these, 1,694, or about 10%, were Black, and about 77% of these attended only four schools: Lincoln had 173 students, all Black; Main Street School had 424 Blacks of 444, about 95%; Kalamazoo School had 454 Blacks out of 558, about 81%; Michigan Avenue School had 276 Blacks out of 373, about 74%. At the other end of the spectrum, 15 elementary schools had no Blacks enrolled, and 10 other elementary schools had less than 10 Blacks.[62]

On June 4, 1964, the Lansing Board of Education adopted the first of a series of important resolutions, a "Policy Statement on Equal Educational Opportunity," generally acknowledging its obligation to provide equal educational opportunity to all children insofar as it was able to do so. "Today's schools," the statement said

"must provide each child with an equal opportunity to learn and to fulfill his innate potential. The schools must assist

each child in discovering and developing his potentialities, and must aid each child in recognizing his inherent worth to himself and to society. . . .

\* \* \* \* \* \*

*"The Board of Education shall not establish or knowingly sustain any condition which is detrimental to a child's sense of individual worth, providing it is within the power of the Board to change such condition."*

At the same time, the Board asserted that its attendance areas for elementary and secondary schools had been established on a geographical basis without regard to race, creed, religion or national origin. While acknowledging that this neighborhood school policy resulted in an "imbalance of minority group pupils," the Board stated that this circumstance resulted from factors beyond the control of the Board, and stated that the policy would continue.[63]

In the fall of 1964, the Board initiated a policy of transporting students out of the River Island area in order to relieve overcrowding and to relieve racial isolation of White schools in other parts of the Lansing School District. This policy continued until the initiation of a more comprehensive transportation plan in the 1972–73 school year, and is discussed in detail, infra, at pp. 619–622.

While taking these steps to ameliorate the difficulties in the River Island area, the School Board decided it needed more detailed information and more informed citizen opinion and recommendations concerning additional steps which might be taken. On February 11, 1965, the Lansing Board of Education resolved to create a Citizens' Advisory Committee on Educational Opportunity, to be composed of citizens from all parts of the district. Among other things, the Committee was charged with making a comprehensive examination of steps to be

---

**62.** Additional Stipulations, No. 14: "Human Relations Report 1964," at 9–10.

**63.** Reprinted in "Human Relations Report 1964," at 5–8. Emphasis added. In 1963, the People of the State of Michigan adopted a new Constitution which provided, "Every school

district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin." Art. VIII, Sec. 2. The Board's Policy Statement is properly in accordance with this provision.

taken to insure an equal educational experience for all children residing in the school district and an examination, too, of the possibility of realignment of school service areas.[64]

■ In the course of their study, the Committee collected statistics on the racial composition of Lansing schools. The data collected on the fourth Friday of the 1965 school year revealed a total of 17,882 elementary school students, of which 1,853, or approximately 10.3% were Black. Of 48 elementary schools existing at that time, 11 had no Black students whatsoever; 7 had either 1, 2, or 3 Black students. On the other hand, several schools were disproportionately Black: Main was 86% Black; Kalamazoo was 79.3% Black; Michigan was 71.3% Black. Six other elementary schools were between 11.5% and 20.5% Black. In addition, the Committee made a more detailed study of many schools. On the basis of all their collected data, the Committee reported, *"Lansing has segregated schools."* [65]

The Committee also studied the effects of segregation. "The work of the Committee," according to its 1966 Report, "involved first-hand observation of the effects of segregated education. Meetings of the committee of the whole, meetings of subcommittees, and individual study and evaluation led to a unanimous conclusion that de facto segregation in our educational system has done and will continue to do great harm both to the individuals involved and to the community as a whole. The committee believes that segregated education and quali-

ty education are not compatible. . . ." Similarly, the Committee concluded that "segregated education is unequal education." [66]

Several recommendations followed from these conclusions. Among other things, the Committee recommended that an existing policy of transporting children from overcrowded schools to other areas of the city continue. (The overcrowded schools were mostly Black, and those transported were consequently mostly Black.) The Committee also recommended that the largely Black schools be phased out completely, and the children transported to other areas of the city. Over the long run, said the Committee, consideration should be given to a variety of positive programs designed to achieve an integrated quality education.[67]

Following the receipt of the Citizens' Advisory Committee Report, the Lansing Board of Education amended its Policy Statement on Equal Educational Opportunity to read, in part, as follows:

"Equal educational opportunity is most possible to achieve in schools where there is reasonable balance in the racial composition of the student population. It shall be the goal of this school district to achieve such balance. The Board of Education believes that in any racially-mixed community segregated education and quality education are not compatible and that steps must be taken to insure that the school system advances further toward the goal of true equality of educational opportunity."

\* \* \* \* \* \*

**64.** Citizens' Advisory Committee on Educational Opportunity, "Report of the Citizens' Advisory Committee on Educational Opportunity" submitted to the Board of Education, June 23, 1966, App. A, at 52–53. (Hereinafter cited as Citizens' Committee Report 1966.)

**65.** Id., App. R–3, at 88–89; 3–4. Italics in original.

While citizen concern with segregation is justifiable and indeed necessary, the characterization of conditions as "de facto" and "de jure" segregation, as counsel for defendants aptly noted at trial, is best left to the court. Witnesses testifying and documents offered in evidence throughout the trial have used a variety

of terms to describe disproportionate racial distribution in schools or neighborhoods. The unreliability of these terms as guides for judicial decisionmaking is exemplified by the fact that in at least one major committee report submitted to the Board, the use of one term rather than the other was decided by majority vote. Testimony of Hortense Canady, Transcript of July 17, 1973 proceedings, pp. 45–46. This court has looked at the facts presented rather than the labels attached to them to draw its legal conclusions.

**66.** Id. at 2, 7.

**67.** Id. at 9–12.

"The Board of Education shall not knowingly establish or sustain any condition which is detrimental to a child's sense of individual worth, and shall actively seek to find ways to change these conditions when such conditions inhibit learning.

". . . However painful the admission, the Lansing Board of Education accepts as a fact that this school district has racially imbalanced schools. Further, it believes not only that segregation is wrong; it asserts with equal conviction that integration is right. The Board of Education recognizes the educational values inherent in the neighborhood school concept. On the other hand, this Board believes that when neighborhood schools result in segregated education and that deviation from the neighborhood-school concept can mean integrated education, that such deviation is much more desirable." [68]

Between 1967 and 1971, the Lansing Board of Education and the administrative authorities conducted further studies and made further recommendations concerning all aspects of the problem of providing an equal, quality education for all Lansing students. By 1971, the original 1966 Citizens' Advisory Committee Report was somewhat dated, so the Board resolved to establish a new and second Citizens' Advisory Committee on Educational Opportunity. Among other things, the Committee was to review the 1966 Report and make new recommendations where necessary; to review the existing policies and official statements of the Board regarding equal educational opportunity, and recommend additions or changes; and to recommend to the Board a plan and

timetable for the final desegregation of all schools in the district. On the basis of 1971–72 school year statistics, the Committee concluded that Lansing elementary schools were "*still segregated,* in terms of governmental requirements." [69]

An examination of all the relevant statistical evidence presented to the court, including the stipulations of the parties, has revealed the following about the Lansing School District during the 1971–72 school year, on the eve of the adoption of the desegregation plan which is the principal subject of this litigation. The District covered an area of approximately 50 square miles, extending in many places beyond the boundaries of the City of Lansing itself. About 33,000 students lived in the District. Of these, 4,600, or about 14% were Black; 2,400, or about 7%, were Spanish-American, and .3% were American Indians. About 18,800 students attended the 48 elementary schools. Of these students, approximately 2,600, or 14%, were Black; 1,400, or 7%, Spanish-American. Two elementary schools were predominantly Black: Main Street School was 85% Black, and Michigan Avenue School was approximately 80% Black and 10% Spanish-American. Cedar Street School, in the northern part of Lansing outside the River Island area was 49% Spanish-American, 46% White, and 4% Black. [70]

*The Cluster Plan*

As the 1971–72 school year drew to a close, the Lansing School Board reviewed the history of the problem of racial and ethnic concentration in the elementary schools, and considered the recommendations of the Citizens' Advisory Committee

---

**68.** Adopted Jan. 19, 1967. Reprinted in "In-Service Training: Board Members and Administrators, Lansing, Mi. January 27 and 29, 1972," (unpaginated). Pl. Ex. 9. (Hereinafter cited as "In-Service Training.")

**69.** Citizens' Advisory Committee on Educational Opportunity, "Report of the Citizens' Advisory Committee on Educational Opportunity, April 20, 1972," at 1. (Hereinafter cited as "Citizens' Committee Report 1972.")

**70.** Lansing School District, "Proposal for Assistance Under Public Law 92–318, Title VII—Emergency School Aid," (1972), at 5. Pl. Ex. 2. (Hereinafter cited as "1972 Proposal."). "River Island Report 1972," App. III–F, at 1. "Ethnic Count Report, Five Year Period Nov. 1967–Dec. 1971," stipulated as accurate, Additional Stipulations, No. 18. Stipulations 2, 7, 10, 15. Some slight discrepancies appear among various statistical stipulations and documentary statistics accepted as accurate. These discrepancies are minor, and do not affect the ultimate conclusions.

on Educational Opportunity, whose Report had been submitted in April. The Committee had suggested the adoption of one of three alternative plans for the integration of the District. The Committee stated that its plans had been framed in recognition of the parameters established by legal decisions rendered since the early 1950's on the subject of desegregation of public education.[71] Two of the three proposed plans involved all elementary schools in the system; the third involved approximately 25.[72] On June 1, the Board resolved to consider its own compromise plan for desegregation involving 13 schools, at a subsequent meeting.

On June 15, 1972, James E. Slack and others, as next friends of minor children, filed a civil action in the Circuit Court of the State of Michigan in and for Ingham County against the Board of Education of the Lansing School District and others, charging that the consideration, adoption, and implementation of the proposed cluster plan would violate their constitutional rights. The Circuit Court issued a temporary restraining order preventing the Board from considering or adopting its plan. As a result of a petition filed by the defendant on June 19, 1972, the cause was removed to this court. After a hearing held on June 26, the temporary restraining order was set aside. Subsequently, by stipulation of the parties the cause was dismissed without prejudice.

Following public hearings and extensive public discussions, the Board of Education, on June 29, 1972, resolved to adopt its proposed cluster plan. In the extensive Preamble to its Resolution, the Board noted that it had fully considered the 1972 Citizens' Advisory Committee recommendations and also the information and comments submitted to it during public hearings. The Board further stated its conclusion that there remained in Lansing several elementary schools which were, "by definition, seg-regated schools." The Board finally reaffirmed the 1964 Policy Statement on Equal Educational Opportunity, including its belief that segregation in schools was wrong and integration in schools was right, and went on to adopt the cluster plan in order "to further progress toward equalization of educational opportunity in the Lansing School District." [73]

The desegregation plan adopted by the Board at that time includes provisions for three cluster groups, two to be implemented in 1972–73, and one to be implemented in addition during 1973–74. The plans involve only grades three through six. No kindergarten, first, or second grade students are involved in any of the three clusters. According to the original schedule, further study and planning were to take place during the period 1972–1974 to the end of developing and implementing additional clusters as the need appeared.

Clusters One and Two were implemented in September 1972, and remained in existence throughout the 1972–73 school year.

Cluster One involves four schools, Main Street, Barnes Avenue, Elmhurst, and Lewton. The operation of Cluster One required the elimination of the fifth and sixth grades at Barnes and Lewton Schools and the elimination of the third and fourth grades at Main and Elmhurst Schools. Transportation is required as follows in Cluster One: (A) All of the third and fourth grade students are transported from Main to Elmhurst. (B) All of the fifth and sixth grade students are transported from Barnes to Main. (C) All of the third and fourth grade students are transported from Elmhurst to Barnes and Lewton. (D) All of the fifth and sixth grade students are transported from Lewton to Elmhurst.[74] The distances involved are not great. The approximate distance between Elmhurst and Barnes is .8 mile; between Elmhurst and Lewton, 1.2 miles; between Barnes and Main, 1.2 miles; between Main and Elmhurst, 2.1 miles; be-

**71.** "Citizens' Committee Report 1972," at vii.

**72.** Stipulation No. 16.

**73.** Lansing Board of Education, Minutes, June 29, 1972. Pl. Ex. 8.

**74.** Additional Stipulations, No. 8.

tween Main and Lewton, 2.6 miles. While travel time depends on traffic patterns and other variables, the plaintiffs offered a formula to estimate the average travel time: Multiply the first mile by five minutes and each subsequent mile by two minutes.[75] Thus, by this formula, the average time to travel the longest distance involved in Cluster One, 2.6 miles, is 8.2 minutes.

Cluster Two likewise involves four schools: Michigan Avenue, Maple Hill, Cavanaugh, and Everett. The operation of Cluster Two required the elimination of the fifth and sixth grades at Cavanaugh and Maple Hill and the elimination of the third and fourth grades at Everett and Michigan Avenue schools. Transportation is required as follows: (A) all of the fifth and sixth grade students are transported from Cavanaugh to Michigan. (B) All of the third and fourth grade students are transported from Everett to Cavanaugh and Maple Hill. (C) All of the fifth and sixth grade students are transported from Maple Hill to Everett.

(D) All of the third and fourth grade students are transported from Michigan to Cavanaugh; some of the fifth and sixth grade students are transported from Michigan to Everett.[76] The approximate distances involved are as follows: Between Cavanaugh and Everett, .8 mile; between Everett and Maple Hill, .4 mile; between Cavanaugh and Michigan, 3.4 miles; between Michigan and Everett, 3.6 miles.[77] The longest travel time, computed according to plaintiffs' formula, is approximately 1.2 minutes.

The parties have stipulated as to the impact of the cluster plans on the racial and ethnic composition of the schools involved. The following chart illustrates the changes which took place when the cluster plan was implemented. The 1971–72 column indicates the percentage of each school which was minority in the last full school year before the clusters were implemented. The 1972–73 column indicates the composition of the schools during the first year with the clusters in effect.

CLUSTERS ONE AND TWO [78]

% Minority

| Cluster One | 1967–68 | 1968–69 | 1969–70 | 1970–71 | 1971–72 | 1972–73 |
|---|---|---|---|---|---|---|
| Main | 97% | 97% | 89% | 90% | 88% | 65% |
| Barnes | 6% | 5% | 6% | 6% | 7% | 15% |
| Elmhurst | 4% | 8% | 9% | 9% | 7% | 19% |
| Lewton | 0% | 0% | 1% | 15% | 11% | 22% |
| **Cluster Two** | | | | | | |
| Maple Hill | 1% | 11% | 17% | 17% | 15% | 24% |
| Michigan | 87% | 84% | 90% | 92% | 90% | 55% |
| Cavanaugh | 1% | 1% | 3% | 4% | 4% | 21% |
| Everett | 2% | 2% | 2% | 3% | 5% | 15% |

Cluster Three involves five schools: Grand River, High, Oak Park, Cedar and Post Oak. Cluster Three will require the elimination of the third and fourth grades at Grand River and Post Oak Schools, and the elimination of the fifth and sixth grades at High, Oak Park and Cedar Schools. The plan requires transportation of third and fourth grade students from both Grand River and Post Oak to both High and Oak Park-Cedar. Fifth and sixth grade students are transported from High to Post Oak and from Oak Park-Cedar to Grand River.[79] As with the other clusters, the

75. Distance Chart, Pl. Ex. 10.

76. Additional Stipulations, No. 8.

77. Distance Chart, Pl. Ex. 10.

78. Data from Lansing School District, Ethnic Count Reports for years 1967 through 1975, Pl.

Exhibits, 67, 66, 65, 69, 64, 72, 63, 73, and 74, respectively.

79. Lansing Board of Education, Minutes, June 29, 1972, App. C. Pl. Ex. 8.

distances involved in Cluster Three are not great. The approximate distance between Grand River and High is .4 mile; between Grand River and Oak Park-Cedar, .8 mile; between High and Post Oak, 1.8 miles; and between Post Oak and Oak Park-Cedar, 2.6 miles. Again applying the travel time formula, it appears that the average time to travel the longest distance involved in Cluster Three is 8.2 minutes.[80]

The impact of the implementation of Cluster Three on the racial and ethnic composition of the schools involved is illustrated in the following chart. The 1972–73 column indicates the percentage of each school which was minority in the last full school year before this cluster was implemented. The 1973–74 column indicates the composition of the schools during the first year Cluster Three was in effect.

CLUSTER THREE[81]

| | 1967–68 | 1968–69 | 1969–70 | 1970–71 | 1971–72 | 1972–73 | 1973–74 |
|---|---|---|---|---|---|---|---|
| Cedar | 41% | 41% | 46% | 45% | 56% | 67% | 50% |
| Grand River | 32% | 29% | 33% | 38% | 37% | 41% | 37% |
| Oak Park | 17% | 27% | 32% | 32% | 37% | 42% | 39% |
| Post Oak | 4% | 4% | 5% | 5% | 5% | 7% | 13% |
| High | 28% | 31% | 34% | 34% | 34% | 35% | 32% |

The following, finally, shows what the effect would be of allowing rescission of the cluster plan at the present time. The 1975–76 column reflects the latest data available showing percentage of minority students in each of the schools involved in the three clusters. The other column reflects what the percentage of minorities would be in each of these schools if there were no cluster plan. Figures in the latter column were taken from an exhibit prepared by school district officials showing what the racial distribution of students in each attendance area is, without regard to their actual school attendance.

EFFECT OF ALLOWING RESCISSION
AT THE PRESENT TIME
CLUSTERS ONE, TWO AND THREE, % MINORITY[82]

| Cluster One | 1975–76 | Without Clusters |
|---|---|---|
| Main | 67% | 80% |
| Barnes | 22% | 14% |
| Elmhurst | 23% | 9% * |
| Lewton | 21% | 3% |

| Cluster Two | 1975–76 | Without Clusters |
|---|---|---|
| Maple Hill | 21% | 5% |
| Michigan | 65% | 83% |
| Cavanaugh | 29% | 9% |
| Everett | 22% | 10% |

| Cluster Three | | |
|---|---|---|
| Cedar | 50% | 57% |
| Grand River | 51% | 43% |
| Oak Park | 43% | 33% |
| Post Oak | 13% | 2% |
| High | 32% | 43% |

Before the cluster plans could be implemented, some Lansing residents undertook to delay or prevent the implementation of the cluster-school plan by removing from office those Board members who had voted to adopt the plan, and replacing them with members who were hostile to the desegregation program. Recall petitions were circulated, signed, and duly filed. A recall election was scheduled for November 7, 1972.

On October 17, 1972, the National Association for the Advancement of Colored Peo-

---

**80.** Distance Chart, Pl. Ex. 10.

**81.** Data from Ethnic Count Reports, see note 78, supra.

**82.** Data from Ethnic Count Reports, see note 78, supra.

* The actual minority enrollment at Elmhurst could be slightly higher if the cluster plan were rescinded because Elmhurst also receives students from the Michigan service area due to

overcrowding (Def. Ex. 84), and the figures supplied by the school district assume absence of both clusters and one-way busing. This effect would appear to be minimal, however, since Elmhurst is the only cluster school which would continue to receive students in this manner. Lewton and Maple Hill receive students from the former Kalamazoo School Area, but at present there is no plan to send these students to any other school.

ple and individual students and their parents who reside in the Lansing School District filed the present action in this court. The plaintiffs asked the court to enjoin the pending recall election and also requested a declaratory judgment and an injunction to prevent the Board from repealing, replacing, or otherwise nullifying the cluster-school plan which the Board had adopted on June 29. Following a hearing, this court on October 27, 1972, refused to enjoin the recall election, but retained jurisdiction of the other matters in this cause.

The election of November 7, 1972, resulted in the recall of five members of the Lansing Board of Education who had voted in favor of the cluster-school plan of June 29. The resultant vacancies were filled in a special election held on January 11, 1973.

At its meeting of February 1, 1973, the newly constituted Board amended Policy Statement 6121 on Equal Educational Opportunity to *omit*, in addition to other language, the following:

"It is the position of this Board that there are three ingredients to a successful program for disadvantaged children: compensatory education, improvement of self-concept, and social and racial integration. It is also the position of this Board that this school system must devise some means of providing for each of these ingredients. . . .

Equal educational opportunity is most possible to achieve in schools where there is reasonable balance in the racial composition of the student population. It shall be the goal of this school district to achieve such balance. This Board of Education believes that in any racially-mixed community segregated education and quality education are not compatible and that steps must be taken to insure that the school system advances further toward the goal of true equality of educational opportunity.

\* \* \* \* \* \*

The Board of Education shall not knowingly establish or sustain any condition which is detrimental to a child's sense of individual worth, and shall actively seek to find ways to change these conditions when such conditions inhibit learning."

The Board amended Policy Statement 6121 in this fashion because (1) it rejected the idea that there was segregated education in Lansing; (2) it concluded that there is a vagueness about "better racial balance;" (3) it believed that better racial balance did not necessarily improve the educational opportunities of the school children.[83]

At the February 1 meeting, the Board adopted the following Resolution rescinding the June 29, 1972 plan:

"Whereas, this Board of Education recognizes that there is a wide diversity of feelings in the community to the cluster plan as an educational experiment, and, whereas there is no conclusive research or evidence to support the contention that the cluster plan, as conceived and instituted does or will improve the educational achievement of the pupils affected, and, whereas the Board feels that the neighborhood family school is preferred for elementary students by the majority of the citizens of this school district, and, whereas the cooperation of parents is essential to the well being of any school system, and, whereas, the community's financial support is vital to the operation of the school district and, whereas there are no schools in this system where an ethnically-imbalanced student population has resulted from an act of de jure segregation; now, therefore, be it resolved that in accordance with the revised policy 6121, the cluster plan as adopted on June 29, 1972, be rescinded at the end of this school year (June 30, 1973). . . ."

The Resolution went on to state that the attendance patterns which existed in 1971–72 in the kindergarten through sixth grade would be restored.[84]

---

83. Proceedings on Proposed Stipulations, May 24, 1973, at 8–9.

84. Proceedings on Proposed Stipulations, May 24, 1973, at 10–11.

The above table, "Clusters One and Two," indicates what the effect would have been on the schools involved in the two clusters if the new board had been allowed to rescind the plan at that time. The 1972–73 column, as noted, is the percentage of minority students in each cluster school with the clusters in effect. If the plan were effectively rescinded, it is reasonable to predict that these schools would have returned to approximately the percentage of minority students which prevailed in 1971–72. Likewise, a comparison of columns for 1973–74, the first year Cluster Three was in effect, and the preceding year, 1972–73, indicates what would have happened if that cluster were not implemented.

On February 27, 1973, at a hearing before this court in the present case, the plaintiffs moved for a temporary restraining order, which was denied. Leave was granted to the plaintiffs to file a supplemental complaint, which they did immediately. In that complaint, the plaintiffs requested, among other things, a preliminary injunction (a) requiring the defendant to cease and desist from effectuating the revision of the Equal Educational Opportunity Policy of the Lansing School District and the nullification of the plan of June 29, 1972, to desegregate the Lansing School District; and (b), requiring the defendant to reinstitute the plan of June 29, 1972, to desegregate the Lansing School system and to take all steps necessarily attendant thereto.

On August 10, 1973, this court issued an opinion and order granting the preliminary injunctive relief requested. This ruling was affirmed by the United States Court of Appeals on August 29, 1973, *NAACP v. Lansing Board of Education,* 485 F.2d 569 (6th Cir. 1973). Cluster III was put into effect at the beginning of the 1973–74 school year, and all three clusters remain in effect at the present time pursuant to the terms of the injunction.

The Lansing Board of Education adopted the cluster plan on June 29, 1972, in order to meet what it reasonably conceived to be its constitutional obligation under the Michigan Constitution and laws and under the Fourteenth Amendment of the United States Constitution.[85]

Given the factual background, the Board reasonably concluded that Lansing elementary schools were *segregated,* that in the racially-mixed Lansing community segregated education and quality education were not compatible, and that further steps had to be taken to insure that the school system advanced toward the goal of true equality of educational opportunity.

The Fourteenth Amendment of the United States Constitution provides in Section 1 that "No State *shall* . . . *deny* to any person within its jurisdiction the equal protection of the laws." (Emphasis supplied.) In Brown I, decided in 1954, the Supreme

---

**85.** Of course, individual board members also had their own motivations. Clarence Rosa, testifying about his reasons for voting for the cluster plan, stated: "I had looked back to see what had happened in the past 15–20 years, and where minorities had come from during that period of time, and I was convinced in my own mind we were going to make progress in the future just as we had made progress in the past; that my own children, or maybe more importantly my grandchildren, are going to be employed by people of another race, they are going to be working next to people of another race, they are going to be neighbors of somebody from another race, and that if that is going to happen—and I fully believe it will—it is going to happen comfortably only if you are comfortable with somebody from another race.

I am not sure that I personally always am, but I think it is important that these young people do develop that kind of rapport where they can live with and work for and work with somebody of a different race than they are, and that the best way for them to—or one way, not necessarily the best—but a way we have a chance of achieving now is for them to associate in school, and therefore I felt it important that we desegregate our schools and arrive at that kind of brotherhood, I guess you would call it, for our children and our grandchildren. . . . Some people think it is morally important, some people think it is constitutionally important. I simply felt it was necessarily a part of a good education program." Tr. 79–80.

Court found that "separate educational facilities" were "inherently unequal," and declared that state-sponsored segregation violated the Equal Protection clause of the Fourteenth Amendment, *Brown v. Board of Education of Topeka,* 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873. Subsequently, in Brown II, the Court ordered desegregation *"with all deliberate speed."* 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Conscious of their obligations under the United States Constitution, the people of the State of Michigan in 1963 adopted a new State Constitution containing the following provisions: [86]

"ARTICLE 8—EDUCATION

"Encouragement of education. Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

"Free public elementary and secondary schools; discrimination. Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district *shall provide for* the educa-

tion of its pupils without discrimination as to religion, creed, race, color or national origin."

■ The use of the word "shall" indicates that the provision is imperative and mandatory, not one which local officials may implement or not as they choose.[87]

In their explanatory address to the people required by the Legislature,[88] the Delegates to the Michigan Constitutional Convention stated, *"The anti-discrimination clause is placed in this* (Education) *section as a declaration which leaves no doubt as to where Michigan stands on this question."* [89] (Emphasis supplied.)

The Michigan Constitution of 1963 established a State Board of Education with broad authority over public education. Article VIII, Section 3, of this Constitution provides:

*"Leadership and general supervision over all public education,* including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, *is vested in a state board of education. It shall serve as the gener-*

---

**86.** The following parallels this court's previous discussion of the subject of the impact of Michigan law on desegregation suits in *Oliver v. Kalamazoo Board of Education,* 346 F.Supp. 766, 778–779, (W.D.Mich.), aff'd. 448 F.2d 635 (6th Cir. 1971).

**87.** "Shall" implies a word of command, and is generally imperative or mandatory. Black's Law Dictionary (4th Ed.), p. 1541. "Constitutional mandates are imperative," *Fairbank v. United States,* 181 U.S. 283, 291, 21 S.Ct. 648, 45 L.Ed. 862. That "shall" is equivalent to the word "must" is a familiar canon of statutory as well as constitutional construction. Generally, principles of statutory construction apply to construction of constitutions. *Rhode Island v. Massachusetts,* 12 Pet. (U.S.) 657, 9 L.Ed. 1233; *Jones v. City of Ypsilanti,* 26 Mich.App. 574, 182 N.W.2d 795.

"It is true our Constitution contains no provision to the effect that all its provisions are mandatory; but we deem this immaterial for the reason that this court has held before the adoption of the present Constitution that all the provisions of a Constitution are mandatory;

and the Constitution must be presumed to have been adopted with this understanding of its meaning. Since the adoption of the Constitution the court has steadily maintained the same rule." McCreary, *Governor v. Spear,* 156 Ky. 783, 162 S.W. 99, 103.

See, generally, 16 Am.Jur.2d Constitutional Law, §§ 90–92.

**88.** Act No. 8, April 17, 1961, Michigan Public Acts of 1961, at 8.

**89.** Michigan Constitutional Convention of 1961–62, "What the Proposed New State Constitution Means to You," 77 (1962).

The forceful language of the Michigan Constitution, adopted nine years after Brown, is unambiguous in its proscription of discrimination in education. Though the court need not and does not rest its decision in this case solely on Michigan law, it alone, without reference to federal law, forbids segregation and requires integration and would thus apparently be ample basis for the ruling of this court.

*al planning and coordinating body for all public education,* including higher education, and shall advise the legislature as to the financial requirements in connection therewith." (Emphasis added.)

In addition, the Constitution created a Civil Rights Commission to secure the equal protection of the civil rights of the people of Michigan.

Article V, Section 29, of the 1963 Constitution of the State of Michigan, provides as follows:

"Civil rights commission; members, term, duties, appropriation. Sec. 29. There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. *It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination.*"

Pursuant to their constitutional mandate, the State Board of Education of Michigan and the Michigan Civil Rights Commission declared the following:

"Joint Policy Statement of, the State Board of Education and Michigan Civil Rights Commission on Equality of Education Opportunity.

"In the field of public education, Michigan's Constitution and laws guarantee every citizen the right to equal educational opportunities without discrimination because of race, religion, color or national origin. Two departments of state government ·share responsibility for upholding this guarantee. The State Board of Education has a constitutional charge to provide leadership and general supervision over all public education while the Michigan Civil Rights Commission is charged with securing and protecting the civil right to education.

"In addition to the declaration of public policy at the State level, the United States Supreme Court, in the case of *Brown vs. Board of Education*, ruled: 'that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal.'

"The State Board of Education and the Michigan Civil Rights Commission hold that segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantees of this state and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society.

"The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.

"While recognizing that racial imbalance in Michigan schools is closely related to residential segregation patterns, the State Board of Education and the Civil Rights Commission propose that creative efforts by individual school districts are essential and can do much to reduce or eliminate segregation. Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and the transfer of pupils from overcrowded facilities. Each

of these situations presents an opportunity for integration.

"The State Board of Education and the Civil Rights Commission emphasize also the importance of democratic personnel practices in achieving integration. This requires making affirmative efforts to attract members of minority groups. Staff integration is a necessary objective to be considered by administrators in recruiting, assigning, and promoting personnel. Fair employment practices are not only required by law; they are educationally sound.

"The State Board of Education and the Civil Rights Commission further urge local school districts to select instructional materials which encourage respect for diversity of social experience through text and illustrations and reflect the contributions of minority group members to our history and culture. A number of criteria are enumerated in 'Guidelines for the Selection of Human Relations Content in Textbooks,' published by the Michigan Department of Education.

"The State Board of Education and the Civil Rights Commission believe that data must be collected periodically to show the racial composition of student bodies and personnel in all public schools, as a base line against which future progress can be measured. Both agencies will begin next month to assemble information on the present situation.

"To implement these policies the State Board of Education has assigned staff of the Department of Education to work cooperatively with the Civil Rights Commission and local school authorities for the purpose of achieving integration at all levels of school activity. The Michigan Civil Rights Commission also stands ready to assist local school boards in defining problem areas and moving affirmatively to achieve quality integrated education.

"Adopted and signed this twenty-third Day of April, 1966," and it is signed by all of the members of the State Board of Education and the Michigan Civil Rights Commission. The Chairman of the Civil Rights Commission at that time was The Honorable John Feikens, who is presently a United States District Court Judge in the Eastern District of Michigan."

■ This court finds that in adopting the desegregation plan of June 29, 1972, the Lansing Board of Education acted in accordance with the mandate of the 1963 Constitution of the State of Michigan and of the policy directives of the Michigan State Board of Education and the Michigan Civil Rights Commission.

■ The Lansing Board of Education is a state body, and as such is directly subject to the requirements of the Fourteenth Amendment of the United States Constitution.

In *Brown I*, supra, the Supreme Court, looking "to the effect of segregation itself on public education," 347 U.S. at 492, 74 S.Ct. at 691, found that "separate educational facilities are inherently unequal." Id., at 495, 74 S.Ct. at 692, and, when sponsored by the state, are a violation of the Equal Protection Clause of the Fourteenth Amendment. Id. Where a constitutional violation has been committed, the Supreme Court said in *Brown II*, supra, school boards had a constitutional duty to desegregate "with all deliberate speed," 349 U.S. at 301, 75 S.Ct. 753.

Since the Board of Education has immediate control over all Lansing public elementary schools, and since the schools were in actuality segregated, the Board could reasonably conclude, and in fact it did conclude, that it had a constitutional duty to enact a desegregation program. Since the Board was invested with immediate power to act, the conclusion would be the same whether or not the segregation was originally and exclusively the result of positive acts of the State. As Judge Damon Keith observed in *Davis v. School District of Pontiac*:

"When the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situa-

tion. Sins of omission can be as serious as sins of commission." 309 F.Supp. 734, 741–42 (E.D.Mich.1970).

Nullification of the June 29, 1972 desegregation plan by the Lansing Board of Education would have the result of resegregating many of the schools involved in Clusters One, Two and Three, and of impeding and frustrating the implementation of a plan adopted to protect the constitutional rights of minority students under the Fourteenth Amendment.

The intent of the new board members to nullify the desegregation plan was evident long before the rescission vote. Some of the newly elected members had been leaders in the movement to recall those who had voted for the cluster plan, and the campaign in the election to fill the vacancies created by the recall made clear the opposition of the new members to the plan. Max Shunk, president of Citizens for Neighborhood Schools, a group organized to oppose implementation of the cluster plans, was elected president of the newly composed board. Board members candidly admitted in their trial testimony that they knew the effect of voting to rescind the plan would be to send Black children from integrated schools back into their segregated schools.[90] Ruby Magee, who was reelected to the Board last April after having been appointed in February 1974 to fill a vacancy created when one of the new Board members died, testified that without a court order, she would vote to disband the clusters.[91]

The new Board's rescission of the cluster plan was an intentional act whose obvious, foreseeable effect would be to resegregate the schools involved, with Black children being reassigned to the Black schools, and White children being reassigned to predominantly White schools.

 If the rescission per se is not sufficient to constitute evidence of de jure segregation, it is highly probative of segregative intent. *Keyes v. School District No. 1,* D.C.Colo., 303 F.Supp. 289; D.C.Colo., 313

F.Supp. 61, aff'd. 10 Cir., 445 F.2d 990, cert. denied as to this portion, 413 U.S. at 195, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Bradley v. Milliken,* 433 F.2d 897 (6th Cir. 1970); *Oliver v. Kalamazoo Board of Education,* supra.

The facts in *Keyes* and *Oliver* were nearly identical, and in both are very similar to those presently before this court. In *Keyes,* the defendant school board adopted three resolutions to desegregate Denver schools, a school board election was held, and before the desegregation plan could be implemented, the new board nullified the plan. While the trial court enjoined the rescission of these resolutions as to most of the schools after a finding that these schools had been intentionally segregated by the Denver school board, the court also permanently enjoined the rescission of the plan as to two schools, East High and Cole Junior High, which had not been previously segregated. The court found that the original plan would operate to prevent East from becoming segregated and to improve educational opportunities for Black students at Cole, and held that the frustration of these objectives by a rescission of the plan was in itself unconstitutional. *Keyes,* supra, 313 F.Supp. at 67 (D.C.Colo.1970). The decree was approved by the Tenth Circuit on appeal, although the appellate court did not reach the question of the rescission, and as to this portion of the Tenth Circuit on appeal, although the appellate court did not reach the question of the rescission, and as to this portion of the Tenth Circuit's action in the Denver case, the Supreme Court denied certiorari. However, it is significant that the Supreme Court noted with implied approval that the trial court had found the rescission of the desegregation plan as to Cole and East was itself an intentionally segregative act. 413 U.S. at 199, n. 10, 93 S.Ct. 2686.

In *Oliver,* similarly, the Kalamazoo Board of Education adopted a desegregation plan on May 7, 1971, and then, after an election, rescinded the plan on July 6, 1971. This

---

**90.** Testimony of Max Shunk, Tr. p. 411; testimony of Ray Hannula, Tr. p. 334.

**91.** Tr. p. 592.

court found "that the July 6, 1971 resolution of the Kalamazoo Board of Education had a purpose and effect so profound that it alone would necessitate a judgment for plaintiffs in this cause." The court went on, however, to note that "this unconstitutional act also compounded defendants' many other constitutionally impermissible actions" and therefore did not rest its decision solely on this basis. *Oliver*, supra, 368 F.Supp. at 198. On appeal, the Sixth Circuit considered the rescission, "in light of the prior cumulative constitutional violation by the school authorities, (as) further evidence of the Board's racially segregative purpose," and refrained from considering the revocation on its own. *Oliver*, supra, 508 F.2d at 185–186.

The Sixth Circuit has also addressed the issue of the validity of nullification of a desegregation plan in *Bradley v. Milliken*, 433 F.2d 897 (6 Cir., 1970), and *Brinkman v. Gilligan*, 503 F.2d 684 (6 Cir., 1974). See also *Cincinnati Board of Education v. HEW*, 396 F.Supp. 203 (S.D.Ohio, 1975); cf. *Martin v. Evansville-Vandenburgh* (Ind.), 347 F.Supp. 816 (S.D.Ind.1972), and *Higgins v. Board of Education of the City of Grand Rapids*, 6 Cir., 508 F.2d 779, 789. In *Bradley*, the Sixth Circuit struck down as unconstitutional a legislative attempt to nullify a plan of the Detroit school board to desegregate its high schools. Relying in its decision in part on the trial court's decision in *Keyes*, the court broadly and emphatically declared:

> "State action in any form, whether by statute, act of the executive department of a State or local government, or otherwise, will not be permitted to impede, delay or frustrate proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment." *Bradley*, supra, at 902.

*Oliver* made clear that the Sixth Circuit's reliance on *Keyes*, which did not involve a legislature, meant that the *Bradley* doctrine must extend to actions of state agencies such as local school boards.

While a recent case again suggests that rescission alone might, in some unique and compelling circumstances be sufficient evidence to fix liability for de jure segregation, *Cincinnati Board of Education v. HEW*, supra, at 227–230, the prevailing view seems to be that rescission is normally only one indicium of segregative intent, and that for it to have independent significance, the rescinded plan must have been constitutionally necessary in the first place. *Brinkman v. Gilligan*, supra. This latter requirement effectively makes talk of "rescission alone" illusory. Finding rescission as an independent act will be superfluous if the legal significance of that act is predicated on the additional finding of earlier acts sufficiently violative of constitutional rights to affirmatively require a remedial plan. It is hypothetically possible that a rescinded plan could have been required by a set of circumstances which no longer would warrant a judicial remedy, but which did when the plan was adopted. However, realistically it is unlikely that the courts will ever be presented with a rescinded plan without other evidence of segregative activity. Whether this is because school boards seldom enact such plans unnecessarily, or because evidence of racial prejudice exists as a social legacy in virtually every region, is a speculative matter which this court need not attempt to answer. But as in the riddle of the chicken and the egg, the court suspects the "true answer" is pragmatically irrelevant.

The rescission in this case seems to have more probative value than the similar actions dealt with in the cases discussed. The Lansing School Board which adopted the desegregation plan was not a "lame duck" group, as were the Dayton and Cincinnati school boards, *Cincinnati Board of Education v. HEW*, supra, at 228, and more significantly, the plan had actually been put into effect in Lansing elementary schools before it was rescinded, unlike the situations in Denver and Kalamazoo.

Thus, in the case at bar, the rescission itself stands out as an unmistakably intentional and effective act of segregation, which should alone justify a finding of remediable constitutional violation. But in

addition, there is independent evidence of constitutional violations sufficient. both to have made adoption of the June 29, 1972 desegregation plan an obligation of the Board, and to compel this court's intervention had there been no such plan.

*One-Way Busing*

For eight years before adoption and implementation of the cluster plan in 1972, the Lansing School District had been busing children to help end racial isolation of certain schools.[92] However, this integration effort was effectuated primarily by phasing out and closing predominantly Black schools, and transporting the pupils to outlying White schools. This "one way busing" program adopted by the Lansing Board of Education caused the burden of desegregating the school system to fall disproportionately on Blacks. It also had the effect of keeping the "neighborhood school policy" a reality for Whites, while making it chimerical for Blacks.

"Where . . . the closing of an apparently suitable negro school and transfer of its pupils back and forth to white schools without similar arrangements for white pupils, is not absolutely or reasonably necessary under the particular circumstances, consideration must be given to the fairly obvious fact that such a plan places the burden of desegregation entirely upon one racial group.

"The minority children are placed in the position of what may be described as second-class pupils. White pupils, realizing that they are permitted to attend their own neighborhood schools as usual, may come to regard themselves as 'natives' and to resent the negro children bussed into the white schools every school day as intruding 'foreigners.' It is in this respect that such a plan, when not reasonably required under the circumstances, becomes substantially discriminating

in itself. This undesirable result will not be nearly so likely if the white children themselves realize that some of their number are also required to play the same role at negro neighborhood schools." *Brice v. Landis*, 314 F.Supp. 974, 978 (N.D. Cal.1969). Cf. *Moss v. Stamford Board of Education*, 350 F.Supp. 879 (D.Conn.1972); *Spangler v. Pasadena City Board of Education*, 311 F.Supp. 501, 524 (D.C.Cal.1970); *Lee v. Macon County Board of Education*, 5 Cir., 448 F.2d 746, 753–54.

The one-way busing began as a response to overcrowded conditions in Black schools. Due to community objections to use of mobile units at Main Street School, the Board authorized transportation of children from that service area to Walnut Street School beginning in September 1964. Beginning in 1965, Black students were bused from Michigan Avenue School to Elmhurst and Fairview, and from Kalamazoo to Forest. Also in 1965, Lincoln School was closed, and its students were bused to Kendon, Mt. Hope, and Reo schools. As Kalamazoo School was phased out beginning in 1968, students were transported from it to Foster, Maple Hill, Wainright, Woodcreek, and Wexford schools. When Kalamazoo was closed in 1970, students from that service area were also bused to Sheridan Road, Attwood, Lewton, and Lyons schools. Each of these reassignments was considered part of an effort to end racial isolation in Lansing elementary schools.[93]

Over the years since 1964 until the advent of the cluster program, over 3,500 students were transported for purposes of integration in Lansing elementary schools. Nearly all of these were Black.[94] This one-way busing has continued even after the initiation of the cluster plan, with 340–350 students currently involved.[95] The distances involved in one-way busing were generally greater than those involved in the cluster plan.[96]

92. Def. Ex. 84.

93. Id., pp. 1–3.

94. Def. Ex. 83, pp. 5–6; testimony of William Webb, Tr. 153, 157.

95. Testimony of Webb, Tr. 157.

96. Id., 155.

One-way busing derived its impetus from the Board's overall plan to phase out most Black schools.[97] One of the prime reasons why the Board found it necessary to close Lincoln and Kalamazoo schools was that it felt their shrinking enrollments made them economically unfeasible to operate.[98] The Board's decision to bus only Black students, ignoring the opportunity to bring White students into the schools with dwindling enrollments and placing the burden of integration solely on Blacks, was discriminatory.

In fairness to this Board, the court observes that their actions instituting one-way busing should be considered in the context of their total efforts to desegregate Lansing schools. Former board president Clarence Rosa testified of their desire since the late 1950's to desegregate the school system, noting that they did in fact implement a plan for secondary schools. "But we were scared to death of this elementary situation," he testified. "We studied it and worked with it until we finally felt we had (a plan) that our community could live with (the cluster plan)."

Rosa testified that one-way busing was implemented at a time when many Black families from the West Side were being displaced due to government and commercial projects. He felt that if Black and White families came together in PTA's and similar situations, as a result of one-way busing, the uprooted families might move into White neighborhoods, creating naturally integrated areas. Unfortunately, he said, this did not occur to any great extent.[99]

Former Board member Kathryn Boucher testified that she felt her votes to close Lincoln and Kalamazoo schools were discriminatory, but that based on advice of community members, and on their own feelings as to what the community would ac-

cept, it was "the way to go" at that time.[100] She testified that although she recognized it as discriminatory at the time, she felt it was an important temporary step, and one which was acceptable to most of the Black community at the time.[101]

These same Board members were the ones who several years later adopted the cluster plan for integrating the elementary schools, and a few years earlier had successfully defended a court suit attacking their plan to integrate the secondary schools. Seen on this continuum, then, their decisions instituting one-way busing cannot be said to have been motivated by a pernicious or invidious intent. Yet while their motivations may have been honorable, and their options circumscribed by their perceptions of political acceptability, the natural and foreseeable effects of their acts were nonetheless clearly discriminatory. Moreover, the Lansing Board of Education has maintained this substantially discriminatory and constitutionally impermissible practice for over a decade.

It should be noted that this discriminatory effect did not go unchallenged in the Black community at the time. A witness called by defendants, John Lewis, is a Black man who served as president of the Main Street PTA during the time one-way busing was in effect there. He testified that he and the PTA Board felt that despite the excellent staff of Main Street School, their children could not get a quality education in a segregated environment, and further that one-way busing was an affront. "We felt that our school was an excellent school, both the structure and the staff that we had there, and we felt kind of being slapped in the face when it was being talked about taking our kids out from our school and filtering them in at some of the other schools, but yet still no one out of the other schools were being brought into Main

---

**97.** Testimony of Vernon Ebersole, Tr. 518–24; testimony of Kathryn Boucher, Tr. 602–04, 612–14; Pl. Ex. 5, pp. 9, 26–27. See also, "1968 Facility Planning Study," Pl. Ex. 38, p. 32.

**98.** See pp. 603–604, supra.

**99.** Tr. 81–82.

**100.** Tr. pp. 603–04.

**101.** Tr. 614.

Street, and this highly upset us." [102] Lewis testified that he communicated these complaints to the Board of Education.

When the new Board voted in February 1973 to rescind the cluster plan, it left intact the practice of one-way busing. While the actions of the old Board can be seen on a continuum as moving toward spreading the burden of desegregation equally between Black and White students, the vote of the new Board clearly manifests a willful intent to place it solely on Black children. The court finds that the Board knew of and intended this effect.[103]

### Site Selection

One final issue demands the court's attention as it reviews indicia of de jure segregation on the part of the defendant school board. In a school district professing a "neighborhood school policy," citizens on the West Side were justifiably anxious to have a new elementary facility as the Board moved to close Lincoln, Kalamazoo, and Michigan schools. There is no reason why this new facility could be obtained only at the price of foregoing integrated education, yet the present Board of Education has evinced a clear intent to operate the new school on a segregated basis.

In *Keyes,* supra, the Supreme Court discussed the discriminatory effect of "the practice of building a school . . . to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school.'" 413 U.S. at 201–202, 93 S.Ct. at 2694. Other courts, too, have said that situating schools, "under the guise of pursuing a neighborhood school policy . . . so that these schools were segregated on the very day they opened their doors," is "positive action to aggravate segregation." *Soria v. Oxnard School District Board of Trustees*, 386 F.Supp. 539, 543 (C.D.Cal.1969). Cf. *Kelly v. Guinn*, 456 F.2d 100, 106 (9th Cir. 1972).

Citizen group proposals for the new West Side facility made clear that though the area is substantially Black, the desire to place an elementary school on the West Side did not indicate any lessening of the commitment to integrated education. The West Side Educational Facilities Ad Hoc Committee recommended:

"That the new school facility constructed within the River Island area become part of a districtwide desegregation and equal educational opportunity program immediately following its completion and subsequent occupancy." [104]

Remarks of Board members at their June 29, 1972 meeting show that they were aware of at least one Michigan federal court decision indicating that no new facilities should be built which continued a segregated condition.[105] The cluster plan resolution adopted that night, included the following provisions:

"(2) Begin immediately to develop educational plans and specifications for a new west-side elementary school facility with the goal of completing construction before September, 1975, and authorize the Superintendent to initiate a site search and a source of funding for this facility; * * *

"(5) Beginning in September, 1975, implement other cluster-school plans as necessary to eliminate any racial imbalance then existing; included in the plans shall be the opening of the new west-side elementary facility as a basis for cluster-school plan development."

When this court enjoined rescission of the cluster plan, it also ordered reinstatement and implementation of these ancillary provisions. However, when the site was selected for the new school (to be called Vivian Riddle Elementary School), it was in the most heavily Black area of the city, and no plan to guarantee integration was forthcoming. In fact, not until October 1975, after forcing the court to consider enjoining

---

**102.** Tr. 302–03.

**103.** See Testimony of Ray Hannula, Tr. 333–34.

**104.** Pl. Ex. 6, p. E–1; Cf. Report of the 1972 Citizens' Advisory Committee on Educational Opportunity," Pl. Ex. 1, p. 8.

**105.** Pl. Ex. 8, p. 7.

construction of the facility, did the Board address the matter. Even then, it adopted a transparently inadequate "plan" which would have merely used the new school, with a projected capacity of well over 500, as a replacement for Michigan Avenue School, whose enrollment is about 200.

In 20 U.S.C. § 1713, Congress has declared a priority of remedies for segregation. Before transportation of students can be considered, the court is required to examine other alternatives, including construction of facilities, to remedy the segregative conditions. Cognizant of obligations under this statute, and believing that if a final determination of segregation liability were made in this case construction of the facility would unduly limit the options the court is mandated to consider, the court on September 22, 1975 ordered the defendant to show cause why construction should not be enjoined. At the show cause hearing, both parties agreed that the new facility could not open as a desegregated school without busing, but both agreed for their own reasons that construction should not be enjoined. Attorney for the defendants argued that the school board had no intention of opening Vivian Riddle School as a segregated facility, and the court declined to issue an injunction.

However, at trial testimony of the Board members themselves indicated that the contrary was true. A majority of the Board members testified that if they could they would operate Vivian Riddle Elementary School strictly as a neighborhood school, knowing this meant its enrollment would be over 90% minority.[106] On the basis of this testimony showing that, absent a court order, there was a significant likelihood the school would be operated as a segregated facility, the court on October 17, 1975 enjoined further construction, and on October 22 appointed an expert to assist it in resolving the matter. The court's expert, Dr. Michael Stolee, Dean of the School of Education at the University of Wisconsin, at

Milwaukee, met with the parties and exhaustively considered every option. On October 26, he reported to the parties and the court that each of the alternatives to building the new school at the proposed site was unsatisfactory for reasons he outlined. He concluded, and recommended to the court, that construction be resumed, with the understanding that transportation of students would be required to desegregate the facility if the court found liability. He further concluded that if liability were found, the new facility is designed with enough flexibility to be adapted to a viable remedy plan. On October 27, the court lifted its injunction. It is expected that the new school will be ready for use by Fall 1976.

The court finds that the Board's decision to place the new facility in an almost entirely Black neighborhood, coupled with its manifest intent to operate it strictly as a neighborhood school, thus guaranteeing a student body over 90% minority, is significant evidence of de jure segregation. It is a deliberate act, adhered to in spite of the court's exhortations during the course of the litigation that the Board voluntarily resolve the matter by submitting a meaningful plan. Seen as part of a pattern of actions by this Board, it proves segregative intent beyond question.

### SUMMARY CONCLUSIONS

The following is a brief summary of the court's findings and conclusions. This recapitulation is not all-inclusive, and is not intended to limit, replace or modify its previously stated findings.

During the past 25 years, Lansing elementary schools have to a substantial degree been segregated in the sense of being racially identifiable as "Black schools" or "White schools."

The Supreme Court in *Swann* defined "de facto segregation" as the existence of racial imbalance in the schools, but with no show-

---

**106.** See testimony of Board members Ebersole, Tr. 559; Hess, Tr. 431–32; Magee, Tr. 592; Shunk, Tr. 420; and Walsh, Tr. 577.

ing that this was brought about by discriminatory action of state authorities. Defendants in this case have argued that the disproportionate racial concentrations in Lansing elementary schools are simply the result of a consistently and neutrally applied neighborhood school policy. For purposes of this case, the court has assumed that the plaintiffs must prove de jure segregation, i. e., that the defendants have intentionally acted or failed to act in ways which have created or maintained segregative conditions. People are presumed to intend the natural, probable and foreseeable consequences of their acts. Thus even practices which appear neutral may be discriminatory in their effects.

Lansing's neighborhood school policy is not only discriminatory in effect, but also has not been administered in a racially neutral manner since the late 1950's. Among the matters within the control of the school board are attendance zones. While the Board insists that it follows a "neighborhood" school policy, it must be emphasized that generally the Board defines the "neighborhood" when it draws the boundaries.

The boundaries established under the neighborhood school policy in the Main-Michigan-Verlinden area were deliberately frozen in the late 1950's, after previous adjustments at Main, in order to contain Blacks in a few schools and avoid integration. The large number of special transfers to Verlinden and the relatively short distance involved suggest that the distance from Main Street and Michigan Avenue School service areas to Verlinden was not in fact so great as to preclude boundary adjustments in order to achieve a more even racial distribution without the necessity of resorting to transportation of students by bus. The boundary changes which the Board did make in 1957 had the foreseeable effect of increasing the racial identifiability of Michigan Avenue School and continuing the racial isolation of White Verlinden School. Further, although the Board had repeated opportunities over the years to re-examine its attendance zone boundaries

as adjacent areas were annexed, it failed to reorganize service areas to eliminate the discriminatory racial isolation.

Similarly, the Board sanctioned special transfers from Main and Michigan schools with the conscious purpose and obvious effect of allowing White students to escape from their neighborhood schools when these were predominantly Black, thus accelerating the trend towards an even more severe racial concentration. Through the use of mobile units, too, the Board continued segregative conditions at Main Street and ignored or postponed opportunities to affirmatively promote integration.

■ The existence of relatively inferior physical facilities at minority schools is another indicium of the defendants' segregative purpose. Lansing's predominantly Black schools generally are located on smaller sites, with more pupils per acre of playground space than most White schools. While physical conditions were allowed to significantly deteriorate at Michigan Avenue School, other Black schools were phased out and eventually closed. Lincoln School was closed in 1965, and Kalamazoo Street School was closed in 1970. Students from these attendance areas, nearly all Black, were transported to predominantly White schools around the district. One of the primary reasons these schools were closed is that their enrollments were dwindling, because such government and commercial projects as the I–496 construction and Oldsmobile expansion removed many family dwellings. Instead of filling the classroom vacancies and simultaneously integrating the schools by bringing White students in, the Board chose to close the schools and bus Black students out, denying them the opportunity to attend their neighborhood school.

This not only indicates that the physical facilities of the Black schools were relatively inferior, but also that the Board at that time was content to place the burden of integration efforts solely on Black children. The School Board has maintained this substantially discriminatory and constitutional-

ly impermissible policy of one-way busing of Black students for over a decade.

Some of the Board's most recent actions leave no doubt that it still intends to use the neighborhood school policy to achieve segregation. The Board approved construction of the new Vivian Riddle Elementary School at a site located in the most heavily Black area of Lansing. While the desire of west side citizens to have a new school in their community is well justified in light of the closings of Lincoln and Kalamazoo Street Schools and the sale of Michigan Avenue School to the state, there is no reason why this new facility can be obtained only at the price of foregoing integrated education.

However, a majority of the present Board members testified at the trial that they would, if they could, operate Vivian Riddle strictly as a neighborhood school, knowing that this means it would have over 90% minority enrollment. Moreover, the school has been built with a capacity large enough to house students from the defunct Lincoln and Kalamazoo service areas. Thus children from these areas now attending integrated, but predominantly White, schools would be relegated to a Black segregated school and the White receiving schools would become resegregated.

From the foregoing it is clear that the Lansing Board of Education since the 1950's has followed a purposeful pattern of racial discrimination by intentionally creating and maintaining segregated schools in Lansing. The Board thus denied Lansing children the opportunity for nonsegregated education and denied them the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution.

Testimonial evidence was presented showing that Black applicants in the early 1950's were told that the district was not hiring Blacks as teachers, or that it already had its quota. Together with statistics showing that the district has not hired minority personnel in proportion to the percentage of its minority students, this gave rise to a presumption of unlawful discrimi-

nation in hiring practices. However, defendants have rebutted this presumption with evidence of diligent recruiting efforts and the absence of discrimination in recent years. Thus the court makes no finding of such employment discrimination.

However, the Board's practice of assigning Black teachers disproportionately to Black schools accentuated the racial identifiability of these schools, and was itself unconstitutional discrimination.

The adoption of the June 29, 1972 desegregation plan was intended to be and was in fact an implementation of the Fourteenth Amendment of the United States Constitution, the mandatory antidiscrimination clauses of the Michigan Constitution of 1963, Art. I, Sec. 2, and Art. VIII, Sec. 2, which were themselves implementations of the Fourteenth Amendment, and the 1966 Joint Policy Statement of the Michigan Civil Rights Commission and the State Board of Education. Apart from the question of whether the Lansing Board was constitutionally required to adopt the June 29 plan or something substantially the same, the Board's actions were "proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment." *Bradley,* supra, 433 F.2d at 902.

Because the Lansing Board of Education, by its intentional acts and failures to act contributed substantially to the creation and maintenance of segregated schools in Lansing, and because its discrimination against Black children existed before and at the time of the June 29, 1972 action to desegregate the dual school system, the June 29 Board was performing its constitutional duty by the creation and implementation of the June 29 integration plan.

Insofar as the desegregation was constitutionally required the Lansing Board was fulfilling its constitutional mandate to act with "all deliberate speed" to put an end to segregation in its schools. *Brown II,* supra.

The Lansing Board of Education's February 1, 1973 vote to rescind the cluster desegregation plan was intended to and did

have the effect of resegregating the elementary schools.

██ The February 1, 1973 resolution was itself an act of de jure segregation committed by the Lansing Board of Education, since this action literally transformed an integrated system into a racially segregated system in direct contravention of the United States Constitution and the rulings of the Supreme Court in *Brown I*, supra; *Bradley*, supra, 484 F.2d 215, at 254; *Green*, supra, 391 U.S. at 439–41, 88 S.Ct. 1689.

The Lansing Board of Education's February 1, 1973 resolution compounded the effects of the Board's earlier constitutionally impermissible actions.

The segregated conditions which existed in Lansing before the adoption of the June 29, 1972 desegregation plan were vestiges of slavery.

The entire content of this opinion embodies the findings of fact and conclusions of law in lieu of those required by Fed.R. Civ.P. 52.

### V.

#### "Transportation" for Regular, Parochial and Special Education Purposes—"Busing" for Integration

The June 29 desegregation plan, voluntarily adopted by the Lansing Board of Education, necessarily involved some transportation of students to fulfill its goals of providing equal educational opportunity for all children. Attorneys for both parties in this case have agreed that, at least in some respects, pupil transportation will be the only effective tool to desegregate the Lansing Public Schools in the short run.[107]

██ While recent statutory enactments counsel courts to first consider other alternatives before ordering pupil transportation, 20 U.S.C. § 1713 (1975 Supp.), Congress specifically refused to attempt to modify or diminish the court's authority to remedy Constitutional violations. 20 U.S.C. § 1702(b) (1975 Supp.). When a remedy is imposed it is not simply to achieve a racial balance in the schools, but to enforce Constitutional rights and correct Constitutional wrongs.

This court has previously recognized that the issue of pupil transportation is often exaggerated and distorted by the opponents of integration. *Oliver*, supra, 368 F.Supp. at 199 (1973), aff'd. 508 F.2d 178, cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). What was said there bears repeating.

To keep the matter in its proper factual perspective, it is appropriate to review the historical and contemporary role of student transportation in our country's educational system.

Chief Justice Burger in his opinion for the Court in *Swann*, supra, declared:

"Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school.

.　　.　　.　　.　　.

"*The importance of bus transportation as a normal and accepted tool for educational policy is readily discernible . . . .*" 402 U.S. at 29, 91 S.Ct. at 1282.

In his partial concurrence in *Keyes*, supra, Justice Powell observed, "The transporting of school children is as old as public education, and in rural and some suburban settings it is as indispensable as the providing of books." 413 U.S. at 243, 93 S.Ct. at 2714.

Furthermore, as the Fifth Circuit observed, "Private schools do not disdain bussing." *United States v. Texas Education Agency* [5 Cir.], supra, 467 F.2d [848] at 874. States may provide transportation for parochial school students if it does so for public school students. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

---

**107.** Transcript of proceedings on order to Show Cause, September 30, 1975.

(Emphasis supplied.)

All authorities agree that the proportion of public school children who are transported is substantial. Chief Justice Burger put the figure at approximately 39%, or eighteen million, in 1969–70. *Swann,* supra, 402 U.S. at 29, 91 S.Ct. 1267. Mr. Justice Powell estimated that "half of all American children ride buses to school *for reasons unrelated to integration.*" *Keyes,* supra, 413 U.S. at 243, 93 S.Ct. at 2714. (Emphasis supplied.) And, Justice Powell noted, Senator Abraham Ribicoff of Connecticut has put the figure at *two-thirds.* Id. at n. 22.

*The important thing is that, nationally, nearly all transportation of students has nothing to do with desegregation. It has been estimated that only three per cent of all school transportation is for purposes of integration.*

\*　\*　\*　\*　\*　\*

The transportation of students to schools some distance away is not entirely without some burden to students and parents. When a child lives some distance from and must be transported to school, his ability to participate in extra-curricular activities is diminished. Similarly, it may be more difficult in some instances for parents to participate in school-related activities. . . .

Those who oppose transportation of students for purposes of integration cite these reasons. However, it is inconsistent for people to demand, or at least accept, the massive transportation of students for all sorts of reasons except integration. Transportation for purposes other than integration has all the inconveniences and disadvantages of transportation for purposes of integration. Since all transportation of students is on a par in this respect the objections to transportation for purposes of integration must be racially related.

Of course, all else being equal, the concept of maintaining schools within walking distance seems convenient to those affected and therefore attractive. However, all things are not equal in a district which has a history of de jure segregation, *Swann,* supra, 402 U.S. at 28, 91 S.Ct. 1267, or in a district which has raised expectations of equal education by proceedings to protect rights guaranteed by the Fourteenth Amendment, *Bradley,* supra, 433 F.2d at 902.

368 F.Supp. at 199–200.

(Emphasis supplied.)

It was this same issue of pupil transportation which attracted the greatest acrimony to school consolidation in the earlier part of this century.[108] Many of the objections to present day busing are not unlike the objections which were raised in opposition to "forced busing" for the purpose of consolidating school districts.[109] Some of the typical objections then were: [110]

— uncertainty about expense

— loss of home school

— disbelief that pupils can be transported comfortably and safely

— children would have to leave home too early and could not get back in time to do chores

— the evil influences could be much greater, particularly if children are transported to village or town schools

— consolidation destroys community life.

These can be seen to be similar to those fears, myths, and objections reported by the United States Commission on Civil Rights

---

**108.** Paul Smith, "Pupil Transportation: A Brief History," 11 *Inequality In Education,* 6 (March 1972). (Hereinafter Smith.)

**109.** "Busing" alone is actually incorrect terminology since the means of transportation were and are varied and have included horse drawn wagons, railroads, trolleys, taxis, steamboats, sleighs and dog sleds, boats, and even a cable basket. Smith, at 13–14.

In addition, it must be recognized that in a system of compulsory education, almost all busing is "forced." (Michigan does require school attendance, M.C.L.A. § 340.731). Of course, as an alternative to pupil transportation, there is precedent for mandatory boarding schools—an alternative which many, I suspect, would feel is harsher than busing. Smith, at 13; Cf. M.C.L.A. § 388.1154.

**110.** Id. at 6.

in a May 1972 publication, "Your Child and Busing." A partial list of those fears and objections would include:

— Buses are not safe

— Busing is too expensive

— It requires long hours away from home, reducing time available for play and study and prevents participation in extra-curricular activities [111]

— there is a right to attend neighborhood schools.

Those fears which can be tested objectively have been shown to be unsupported. For example, busing safety is generally very high. The accident and injury rate is usually higher for children who walk to school because of other temptations along the route.[112] The Lansing School District has recognized that very fact in its own past and present policies which, in the interest of safety, allow for busing elementary school students living within the usual 1½ mile walking distance.[113]

While buses and pupil transportation obviously are not without expense, the cost, in relation to school budgets as a whole, is usually quite small.[114] Even after the entry of the preliminary injunction in this case, the cost of transportation for integration for the 1975–76 school year [115] is less than 10% of the total transportation cost of the Lansing School District, which in turn is only 3.3% of the total operations expenditures for the year.[116]

The Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 30–31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971), recognized some validity to certain objections to transportation/busing. The Court said that the time or distance of travel should not be "so great as to either risk the health of the children or significantly impinge on the educational process." But what is excessive? A 1938 survey of superintendents recommended only a 12.25 mile travel distance for elementary school children.[117] In addition, since 1940, an overall one-hour one-way standard has generally been recognized as acceptable,[118] though of course schools should al-

---

**111.** Extracurricular activities would seem to be more significant where junior and senior high schools are involved. This case concerns only elementary schools.

**112.** Id. at 19.

**113.** Def. Ex. 83.

**114.** Smith, supra, at 16.

**115.** The integration plans are both the ones implemented as the result of this court's in-

junction and as the result of self-imposed plans.

**116.** Based on Def. Ex. 83 it appears that for the eleven-year period beginning in 1965–66 and ending with the present school year, the cost of transportation for the purpose of integration has averaged 13.38% of the total cost of transportation and .31% of the total cost of operation of the district. The percentages for each year were:

| Year | Percent of total transportation | Percent of total operation |
|------|-------------------------------|---------------------------|
| 1965–66 | 11.37 | .21 |
| 1966–67 | 19.66 | .35 |
| 1967–68 | 11.42 | .21 |
| 1968–69 | 14.43 | .29 |
| 1969–70 | 11.02 | .30 |
| 1970–71 | 6.38 | .13 |
| 1971–72 | 9.91 | .21 |
| 1972–73 | 20.62 | .47 |
| 1973–74 | 20.48 | .43 |
| 1974–75 | 14.77 | .39 |
| 1975–76 | 9.62 | .31 |

---

**117.** Smith, at 19–20.

**118.** Smith, at 17.

ways seek to minimize travel time. Finally, it is not unwarranted to conclude that transportation/busing itself is neutral physically, psychologically, and educationally.[119]

Subjective fears and objections to pupil transportation, which as noted above were the most acrimonious aspect of opposition to school consolidations, appear to dissipate substantially over time.[120] There is no reason to believe that the same will not occur with respect to transportation for the purpose of desegregation. In fact, the evidence in this case supports that conclusion. To the extent it does not dissipate, the hostility is more likely evidence of an opposition to desegregation than to busing.

Michigan and Lansing have long utilized pupil transportation. While Massachusetts led the nation in 1869, in enacting legislation to aid in pupil transportation, Michigan followed suit in 1903,[121] and has continued to expand its aid of pupil transportation even to including private school pupils also.[122]

In the Lansing area, while the Lansing School District itself did not offer pupil transportation for attendance until the late 1950's, students had long been transported into its secondary schools by the neighboring school districts. When these districts consolidated with Lansing, Lansing took over the busing operations. And since that time, Lansing has greatly expanded its pupil transportation program. Lansing has for some time now provided transportation to elementary school pupils who live too far from school for walking or for whom busing will allow significantly safer access to school.[123] As can be seen, desegregation is just one of several legitimate purposes for which the tool of busing is used.

Objections to busing apply similarly to all and it cannot be said that achievement of integration is a less important goal than the others. Because integration transportation is to right injustices and constitutional wrongs, it justifies the highest priority.

In a very real sense, transportation/busing to integrate schools is itself a compromise. It provides equal educational opportunities for all public school children, but it does not prevent parents who so desire from raising their children in otherwise segregated environments. The court has the power to remedy unconstitutional conditions existing in public schools by insuring to all American children the equal protection of the law, but it cannot order people to be charitable to one another in their daily affairs. The law provides impetus, sets limits, corrects abuses—it is an external conscience. But the change of heart must come from within. That is why desegregating the schools our young children attend, whatever its immediate gains, is primarily a reflection of our hope for the future.

Justice Harlan, in 1896, wrote in his famous dissent in *Plessy v. Ferguson:*

"The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law. . . . The sure guaranty of the peace and security of each race is the clear, distinct, unconditional recognition by our governments, national and state, of every right that inheres in civil freedom, and of the equality before the law of all citizens of the United States, without regard to race." *Plessy v. Ferguson,* 163 U.S. 537, 560, 16 S.Ct. 1138, 1147, 41 L.Ed. 256.

This court has noted during these proceedings that among the most fundamental values the Constitution of the United States

**119.** Robert Coles, "Does Busing Harm Children?" 11 *Inequality In Education* 25 (March 1972); but see 20 U.S.C. § 1702 (1975 Supp.)

**120.** Smith at 19.

**121.** Smith at 12–13.

**122.** Def. Ex. 83; M.C.L.A. § 388.1177.

**123.** Def. Ex. 38.

was established to protect are justice and domestic tranquility. Justice precedes domestic tranquility in the Preamble to the Constitution, for without justice, there can be no domestic tranquility. Moreover, we cannot understand what justice means if we fail to realize that the source of just activities springs from the two great commandments—that we love God with our whole heart and soul, and that we love our neighbor in the same manner. Love of our fellow human beings is an essential element of justice; without it we cannot hope to achieve peace in our great land.

It is appropriate to note here the concluding statement of the United States Commission on Civil Rights, in its report mentioned above:

> For 50 years, the school bus has been a friendly figure—an accepted and vital part of the American educational picture. Without the bus, millions of Americans would have had to rely on the limited educational offerings of one-room schools. Some might never have completed school.
>
> Now, because it is being used to carry out desegregation plans, some suddenly have cast the familiar yellow bus as a villain. It is a reversal of roles that cannot but trouble thoughtful Americans.
>
> *The basic issue is not busing but integration.* Either we continue moving toward the goal of integration, or we reject it and hold onto the separate schooling outlawed in the *Brown* decision. In rejecting busing in the racially segregated situation in which most Americans live today, we also reject integration.

(Emphasis supplied.)

Instead of resisting busing, the Nation should seek to follow the example of some 30 seventh graders at Jefferson Junior High School in Pontiac. After buses were burned, schools were picketed, and children were called insulting names, the seventh graders decided to come to the defense of busing and integration in that city. They formed a biracial organization, called "The Group," which travels from school to school, putting on skits and conducting other activities in behalf of racial harmony in Pontiac. Their slogan:

> "We Can Make It Work."

It is a motto worthy of parents, educators, all branches of government, and the Nation as a whole.

## VI.

■ The plaintiffs in this case have proven the existence of a dual school system in Lansing:

> "This is not a case . . . where a statutory dual system ever existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system." *Keyes*, supra, 413 U.S. at 201–02, 93 S.Ct. at 2694.

Thus the defendant Lansing Board of Education is clearly charged with "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, supra, 391 U.S. at 437–38, 88 S.Ct. at 1694. The Court in *Green* admonished that " 'the time for mere "deliberate speed" has run out' . . .. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." (Emphasis in original.)

Although the June 29, 1972 desegregation plan was somewhat modest, it was *voluntarily* adopted by responsible Lansing school authorities in a bona fide effort to bring substantial equality of opportunity to all children in Lansing as mandated by the

Constitution. The cluster plan, moreover, was the result of several years of public discussion of the problem of segregated schools in Lansing, and its adoption was immediately preceded by intensive exploration by the Board and debate by the public.

Since the Lansing authorities were responsibly performing their constitutional duties when they adopted the June 29 plan, the court believes that it may well serve as the basis for an appropriate remedy in this case. However, the passage of three and one-half years since its adoption, as well as testimony during trial about revisions which may be desirable, make it advisable that the question of remedies be left open at this time.

As in any school desegregation case where violation of the Fourteenth Amendment has been found, the primary responsibility for providing a remedy lies with school authorities. The present School Board had numerous opportunities throughout the course of this case to terminate the litigation by voluntarily integrating the elementary schools. Instead of resolving the matter themselves, the Board members chose to pursue the litigation and force the court to decide the hard issues involved.

Their decision to continue this action may have been based upon the same erroneous premise which underlay their rescission resolution, viz., "there are no schools in this system where an ethnically-imbalanced student population has resulted from an act of de jure segregation." Since this premise has been demonstrated false, it is reasonable to expect that the Board would want to re-examine its conclusion that the plan should be rescinded. Now that the Board's responsibility for the segregated conditions of Lansing elementary schools is established beyond question, the court hopes that it will work diligently with the school administration to devise a plan which will eliminate all vestiges of illegal discrimination from the Lansing School District.

Such plans must consider many variables, and are best framed by those intimately familiar with the daily operations of the school system. The court may refer plans submitted by the parties to an expert for evaluation. If necessary, the expert will also be asked to revise or supplement the proposed plans. The proposal should originate, however, with the Lansing school officials or citizens. The court has regularly reminded the parties that the primary obligation of administering the school system lies with the local school board; federal courts enter the picture only when the local board fails to carry out its obligations.

## APPENDIX A

## CONSTITUTION OF UNITED STATES

### AMENDMENT XIV.

§ 1. Citizenship rights not to be abridged by states

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The relevant portion of this section is: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." This language is plain, simple, English, and ought to be easily interpreted.

The Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 490, 74 S.Ct. 686, 689, 98 L.Ed. 873 stated:

In the first cases in this Court construing the Fourteenth Amendment, decided

shortly after its adoption, the Court interpreted it as proscribing all state-imposed discriminations against the Negro race.[5]

[5] *Slaughter-House Cases,* 16 Wall. (83 U.S.) 36, 67–72 [21 L.Ed. 394] (1873); *Strauder v. West Virginia,* 100 U.S. 303, 307–308 [25 L.Ed. 664] (1880):

"It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

See also *Virginia v. Rives,* 100 U.S. 313, 318 [25 L.Ed. 667] (1880); *Ex parte Virginia,* 100 U.S. 339, 344–345 [25 L.Ed. 676] (1880).

The following are excerpts from cases cited in Brown:

*Ex parte Virginia* explained the purpose of the Amendment:

One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression by law because of race or color. They were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress. They are to some extent declaratory of rights, and though in form prohibitions, they imply immunities, * * *.

Supra, 100 U.S. at 344–345.

Strauder continues:

"This [the Fourteenth Amendment] is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy. The true spirit and meaning of the amendments, as we said in the *Slaughter-House Cases* (16 Wall. 36), cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed. Discriminations against them had been habitual. It was well known that in some States laws making such discriminations then existed, and others might well be expected. The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence. Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves. They especially needed protection against unfriendly action in the States where they were resident. It was in view of these considerations the Fourteenth Amendment was framed and adopted. It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from

them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation. To quote the language used by us in the *Slaughter-House Cases,* "No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested,—we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them." * * *

If this is the spirit and meaning of the amendment, whether it means more or not, it is to be construed liberally, to carry out the purposes of its framers. * * *

* * * If in those States where the colored people constitute a majority of the entire population a law should be enacted excluding all white men from jury service, thus denying to them the privilege of participating equally with the blacks in the administration of justice, we apprehend no one would be heard to claim that it would not be a denial to white men of the equal protection of the laws. Nor if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the amendment. Supra, 100 U.S. at 306–308.

## APPENDIX B

*Bradley, et al. v. Milliken, et al.,* 484 F.2d 215, 245–249 (1973).

### A. Status of School Districts under Michigan Law

This conclusion is supported by the status of school districts under Michigan law and by the historical control exercised over local school districts by the legislature of Michigan and by State agencies and officials, which we now discuss.

As held by the District Court, it is well established under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience.

The Northwest Ordinance of 1787 governing the Territory of Michigan provided: "Religion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Art. III.

With this genesis, Michigan's four Constitutions have clearly established that the public school system in that State is solely a State function. The Constitution of 1835 in Article X, Section 3, provided, in part: "The legislature shall provide for a system of common schools . . ." The Constitution of 1850, Article XIII, Section 4, provided, in part: "The legislature shall . . provide for and establish a system of primary schools . . ." Section 1 of the same Article provided, ". . . the Superintendent of Public Instruction shall have general supervision of public instruction . . ."

The Constitution of 1908 in Article XI, Section 2, provided that the Superintendent of Public Instruction "shall have general supervision of public instruction in the State." Article XI, Section 9, provided, in part as follows:

"The legislature shall continue a system of primary schools, whereby every school district in the State shall provide for the education of pupils without charge for tuition . . ."

The Constitution of 1963, the present Constitution of the State of Michigan, in Article VIII, Section 2, provides, in part as follows:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

In interpreting the above educational provisions of the Constitution of 1850, the Michigan Supreme Court stated: "The school district is a state agency. Moreover, it is of legislative creation . . ." *Attorney General v. Lowrey,* 131 Mich. 639, 644, 92 N.W. 289, 290 (1902). Again, interpreting the Constitution of 1850, the Supreme Court of Michigan in *Attorney General v. Detroit Board of Education,* 154 Mich. 584, 590, 118 N.W. 606, 609 (1908), adopted lower court language which read:

"Education in Michigan belongs to the state. It is no part of the local self-government inherent in the township or municipality, except so far as the Legislature may choose to make it such. The Constitution has turned the whole subject over to the Legislature . . ."

The Supreme Court of Michigan interpreted Article XI, Section 9, of the Constitution of 1908 to mean:

"The Legislature has entire control over the schools of the state subject only to the provisions above referred to. The division of the territory of the state into districts, the conduct of the school, the qualifications of teachers, the subjects to be taught therein, are all within its control." *Child Welfare v. Kennedy School Dist.,* 220 Mich. 290, 296, 189 N.W. 1002, 1004 (1922).

In the leading case concerning construction of this section of the Michigan Constitution of 1963, the Michigan Supreme Court said:

"It is the responsibility of the state board of education to supervise the system of free public schools set up by the legislature and, as a part of that responsibility, to promulgate regulations specifying the number of hours necessary to constitute a school day for elementary school students as well as for other classifications or groupings of students, to determine the curricula and, in general, to exercise leadership and supervision over the public school system." *Welling v. Livonia Board of Education,* 382 Mich. 620, 624, 171 N.W.2d 545, 546 (1969). See

also *Governor v. State Treasurer,* 389 Mich. 1, 13, 203 N.W.2d 457 (1972).

Michigan has not treated its school districts as sacrosanct. To the contrary, Michigan always has regarded education as the fundamental business of the State as a whole. Local school districts are creatures of the State and act as instrumentalities of the State under State control. *Cf. Senghas v. L'Anse Creuse Public Schools,* 368 Mich. 557, 118 N.W.2d 975 (1962); *McLaughlin v. Board of Education,* 255 Mich. 667, 239 N.W. 374 (1931).

The record discloses a number of examples of State control over local public education in Michigan.

1. Following the holding of *Welling v. Livonia Board of Education, supra,* that there was no minimum length of day required under the 180-day school attendance rule absent a State Board of Education regulation, the Michigan State Board of Education, acting under its Constitutional mandate without legislative authority, established an administrative rule requiring local school boards to provide a minimum number of hours per school year. See, School Districts Child Account for Distribution of State Aid, Bulletin No. 1005, Michigan State Department of Education (1970).

2. Public Act 289 of 1964 (M.S.A. § 15.-2299(1) et seq., M.C.L.A. § 388.681 et seq.) required Michigan school districts to operate K–12 systems. When Public Act 289 became effective, 1,438 public school districts existed in Michigan. By the beginning of 1968, this figure had been reduced to 738, meaning that 700 school districts in Michigan have disappeared since 1964 through reorganization. Annual Report, Committee on School District Reorganization, 1968 Journal of the Senate 422–423 (March 1, 1968).

3. Pursuant to Act 289 of 1964, *supra,* the State Board of Education ordered the merger of the Brownstown No. 10, Hand, Maple Grove and Carson school districts, all in Wayne County. The action is best explained by the fact that Brownstown was,

at that time, the wealthiest school district in the State, indeed, with a property valuation of $340,000 backing each child, perhaps the wealthiest district in the nation, while the other three districts were extremely poor.

4. When the Sumpter School District was on the verge of bankruptcy in 1968, the State Board of Education, acting under Public Act 239 of 1967 (M.S.A. § 15.2299(51) et seq., M.C.L.A. § 388.711 et seq.), merged the district with four adjoining districts, including the Airport School District. Significantly, though Sumpter was in Wayne County, Airport was in Monroe County, showing that county lines are not inviolate in Michigan.

5. The Nankin Mills School District in Wayne County was beset with financial problems and had no high school. Again, pursuant to Act 239, the State Board of Education in 1969 ordered this school district to merge with the Livonia, Garden City and Wayne Community schools.

6. When the Inkster School District in Wayne County was on the verge of financial bankruptcy, the Michigan legislature passed Public Act 32 of 1968 (M.S.A. § 15.1916 et seq., M.C.L.A. § 388.201 et seq.) enabling the district to borrow $705,000 but on the condition that if the district could not balance its budget, the State Board of Education could reorganize, merge or annex the district. The legislative history of Act 32 indicates at least two legislators voted against the bill in the House of Representatives because of the excessive control given to the State Board of Education:

"I voted No on House Bill No. 3332 because in setting up the machinery to bail out distressed districts, it takes from the local communities the control over their own educational system by providing for excessive arbitrary reorganization powers in the hands of the Board of Education . . ."

"This bill certainly sets up the State Board of Education to be a dictator of all school districts that run into financial problems." 1968 Journal of the House of Representatives 1965.

7. Too small and too poor to operate a high school, the all-black Carver School District in suburban Oakland County reached a crisis in 1960 when other surrounding white districts refused to accept Carver pupils on a tuition basis. The Carver district was merged with Oak Park.

8. The State Board of Education and Superintendent of Public Instruction may withhold State aid for failure to operate the minimum school year. M.S.A. § 15.3575, M.C.L.A. § 340.575. In 1970, funds were withheld from the City of Grand Rapids School District. 17 Michigan School Board Journal 3 (March, 1970). For Attorney General Opinions holding that State aid may be withheld by the State Board of Education from school districts for hiring uncertified teachers, defaulting on State loans and for other reasons, see Op.Atty. Gen. No. 880, 1949–1950 Report of the Attorney General 104 (January 24, 1949, Roth); No. 2333, 1955 Report of the Attorney General 561 (October 20, 1955, Kavanaugh); No. 4097, 1961–1962 Report of the Attorney General 553 (October 8, 1962, Kelley). .

9. The State of Michigan contributes, on the average, 34% of the operating budgets of the 54 school districts included in the proposed Metropolitan Plan of Integration. In eleven of the 54 districts, the State's contribution exceeds 50% and in eight more, it exceeds 40%. State aid is appropriated from the General Fund, revenue raised through state-wide taxation, and is distributed annually to the local school districts under a formula devised by the legislature. See, e. g., Public Act 134 (1971), M.S.A. § 15.1919(51), M.C.L.A. § 388.611.

Though the local school districts obtain funds from the assessment of local property, the ultimate authority in insuring equalized property valuations throughout the State is the State Tax Commission. M.S.A. § 7.631 et seq., M.C.L.A. § 209.101 et seq.; M.S.A. § 7.206, M.C.L.A. § 211.148; M.S.A. § 7.52, M.C.L.A. § 211.34. The State's duty to equalize is required by the Michigan Constitution, Article IX, Section 3. This "State equalized valuation" serves as the basis for

calculating local revenue yields. See, Ranking of Michigan Public High School—School Districts by Selected Financial Data, 1970, Bulletin 1012, Michigan State Department of Education (1971).

10. The Michigan School Code reaffirms the ultimate control of the State over public education. Local school districts must observe all State laws relating to schools,[1] hold school a minimum number of days per year,[2] employ only certified teachers,[3] teach civics, health and physical education and drivers' education,[4] excuse students to attend religious instruction classes,[5] observe State requirements when teaching sex education,[6] make annual financial and other reports to the Superintendent of Public Instruction,[7] adopt only textbooks which are listed with the Superintendent of· Public Instruction [8] and must follow all rules and regulations of the State Department of Education.

[1] M.S.A. § 15.3252(c), M.C.L.A. § 340.252(c).
[2] M.S.A. § 15.3575, M.C.L.A. § 340.575.
[3] M.S.A. §§ 15.1023(10)(a), 15.3570 M.C.L.A. §§ 388.1010(a), 340.570.
[4] M.S.A. §§ 15.1951, 15.3361, M.C.L.A. §§ 388.-371, 340.361; M.S.A. §§ 15.3781–15.3782, M.C.L.A. §§ 340.781–340.782; M.S.A. § 9.2511(c), M.C.L.A. § 257.811(c).
[5] M.S.A. § 15.3732(g), M.C.L.A. § 340.732(g).
[6] M.S.A. § 15.3789, M.C.L.A. § 340.789.
[7] M.S.A. § 15.3612, M.C.L.A. § 340.612; M.S.A. §§ 15.3616, 15.3688, M.C.L.A. §§ 340.616, 340.-688.
[8] M.S.A. § 15.3887(1), M.C.L.A. § 340.887(1).

Local school districts, unless they have the approval of the State Board of Education or the Superintendent of Public Instruction, cannot consolidate with another school district,[9] annex territory,[10] divide or attach parts of other districts,[11] borrow monies in anticipation of State aid,[12] or construct, reconstruct or remodel school buildings or additions to them.[13]

[9] M.S.A. § 15.3402, M.C.L.A. § 340.402.
[10] M.S.A. § 15.3431, M.C.L.A. § 340.431.
[11] M.S.A. § 15.3447, M.C.L.A. § 340.447.
[12] M.S.A. § 15.3567(1), M.C.L.A. § 340.567(a).
[13] M.S.A. § 15.1961, M.C.L.A. § 388.851, Op. Atty.Gen. No. 1837, 1952–1954 Report of the Attorney General 440 (Nov. 8, 1954).

The power to withhold State aid, of course, effects enormous leverage upon any local school district, since on the average 34 per cent of the operation budget of the 54 school districts included in the proposed Metropolitan Plan is paid for by the State.

In the instance of the City of Detroit, the State exhibited its understanding of its power over the local school district by the adoption of Act 48 of the Public Acts of 1970 which repealed a high school desegregation plan previously adopted by the Detroit Board of Education. See 433 F.2d 897.

### APPENDIX C

The Fifth Circuit Court of Appeals, sitting en banc, rejected "the anodyne dichotomy of classical de facto and de jure segregation," in the following language:

While there is admittedly no catholicity of viewpoint in the Circuits on the question of intentional state action, this Court has never tempered its prohibition of school board actions that create, maintain, or foster segregation by the requirement that a discriminatory intent be shown. The underpinning of our decisions is a determination of the unlawful effect of state action upon the existence of unitary school systems. *Lee v. Macon County Board of Educ.,* 5 Cir. 1971, 448 F.2d 746, 752; *Stout v. United States,* 5 Cir. 1971, 448 F.2d 403, 404, *citing Cooper v. Aaron, supra* [358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5]; *Bush v. Orleans Parish School Board,* E.D.La.1960, 190 F.Supp. 861, *aff'd sub nom. City of New Orleans v. Bush,* 1961, 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239; *United States v. Texas,* E.D.Texas 1971, 330 F.Supp. 235, Part II, *aff'd as modified, United States v. Texas,* 5 Cir. 1971, 447 F.2d 441. *See Wright v. City of Brighton, Ala.,* 5 Cir. 1969, 441 F.2d 447, *cert. denied, Hoover Academy v. Wright,* 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190; *Hall v. St. Helena Parish School Board,* 5 Cir. 1969, 417 F.2d 801, 807, *cert. denied* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; *Henry v. Clarksdale Municipal School District,* 5 Cir. 1969, 409 F.2d 682, 687, *cert. denied* 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242.

This principle has now become the law of the land. In *Wright v. Council of [the]*

*City of Emporia*, 1972, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 [1972], the Supreme Court held that the city could not create a new school district separate from that of the surrounding county where "its effect would be to impede the process" of the court-ordered dismantling of a dual school system, *id.* [at 470] 92 S.Ct. at 2207, finding that under its previous decisions in *Green v. County School Board*, 1968, 391 U.S. 430, 8 S.Ct. 1689, 20 L.Ed.2d 716, and *Monroe v. Board of Commissioners*, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, school board action must be judged "according to whether it hinders or furthers the process of school desegregation." *Id.* [407 U.S. at 460] 92 S.Ct. at 2202. Citing with approval our decisions in *Lee* and *Stout, supra,* the Court rejected the "dominant purpose" test adopted by the Fourth Circuit decision in the case, focusing rather "upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. . . . [T]his 'dominant purpose' test," said the Court, "finds no precedent in our decisions." *Id.* at [461, 92 S.Ct. at] 2203.

Importantly, the dissent voiced no opposition to the discarding of purpose and motivation, but objected only to the majority's factual determination that the action of the city in creating its own school district would impede the progress of desegregation.

School cases serve to emphasize the correctness of this principle, for regardless of motive, the children that suffer from segregation suffer the same deprivation of educational opportunity that *Brown* condemns. No one would suggest that the validity of a segregation law depends upon the legislators' motives in enacting it, or that such a law is unconstitutional only when it can be ascribed to racial animus. Why then the distinction between types of school board action that produce segregation? "[T]he factor of malevolent motivation is farther from the core of invidiousness that condemns explicit racial discrimination than are the

odious effects produced." *Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis,* 60 Calif.L. Rev. 275, 291 (1972).[7]

467 F.2d 142, pp. 150–151.

### APPENDIX D

Judicial rationalization for the justification of slavery in turn became vestiges of slavery and the rationalization for the continuation of vestiges of slavery likewise in turn became further vestiges of slavery.

The following is a combination of excerpts from The Report of the Select Committee on Equal Educational Opportunity, United States Senate, 92D Congress, 2d Session, Report No. 92–000, pages 191, 192, and 193; The Long Road to Humanity, by Stanton A. Coblentz, Library of Congress Catalog No. 58–10603, at pages 339, 340; and *Schultz v. Stark,* 238 Mich. 102, at 103–104, 213 N.W. 102.

#### Chapter 15—School Desegregation and the Law

#### A. A BRIEF BACKGROUND

Since ratification of the 14th Amendment in 1868, racial equality under law has been a fundamental principle of the American legal system. That was not always the case. For over 300 years, virtually all black Americans had been denied the most basic rights of American citizenship. In 1865, nearly 90 percent of all Americans of African descent were slaves. These black people were not American citizens; at law they were considered the personal property of their owners. They were not entitled to the vote, nor to due process of law in the courts. They were not permitted to own possessions, or even to marry without proprietary consent. The average life expectancy of black Americans was two-thirds that of whites.

Perhaps the most graphic description of the total subordination of Negroes in America before the Civil War is provided by the Supreme Court's 1857 decision in *Dred Scott v. Sandford,* 60 U.S. (19 How.) 303, 15 L.Ed. 691. There the court invalidated the

"Missouri Compromise," an Act of Congress excluding slavery from portions of the Northwest Territories—as an unconstitutional restriction of the property rights of slaveowners and potential slaveowners. Those property rights were guaranteed against Federal infringement under the due process clause of the 5th Amendment to the U.S. Constitution.

The court held that in the eyes of the Constitution black Americans were:

> . . . considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the government might choose to grant them.

In the same way, the judicial cases concerning slavery will reveal many unvarnished truths. A résumé of a small number will suffice to indicate the complexion of all.

To begin with a case that reflects general attitudes, what constitutes insolence in a slave? This was the question before the court in North Carolina in 1852, in the case of *State v. Bill,* 35 N.C. 373. And here is the opinion of Justice Nash, of the Supreme Court:

> What acts in a slave toward a white person will constitute insolence, it is manifestly impossible to define—it may consist in a look, the pointing of a finger, a refusal or a neglect to step out of the way when a white person is seen to approach. But each of such acts violates the rules of propriety, and if tolerated, would destroy that subordination, upon which our social system rests.[12]

This, certainly, is eloquent. If even a look, or a "refusal or neglect to step out of the way," can be construed as insolence of a type threatening to "destroy that subordination, upon which our social system rests," we can only conclude that the inferiority of the Negro is one of the pillars of society and that a second and equal support is the effort to make a demonstration of that inferiority.

However, we need not judge merely by such an expression of opinion. One of the abhorrent features of slavery in the United States, which subjected it to the most criticism in its own day and which was, in fact, responsible for making many Abolitionists, was the denial of the basic rights of the family, the liability of the wife to be separated from the husband or the child from the mother, with no more regard for human feelings than if they had been members of a litter of puppies. While many slave-holders would not permit such breaches, the cases tell us time after time of less considerate owners.

Following the Civil War, dramatic changes in the legal status of Negro Americans were attempted through constitutional amendment.

In 1865, the 13th Amendment outlawed slavery and involuntary servitude—except as punishment for crime. Ratification of the 14th Amendment followed in 1868, conferring citizenship on *all* persons born within the United States and guaranteeing the rights of due process of law and equal protection of the laws to all persons. The trilogy of civil rights amendments was completed in 1869 with the 15th Amendment by prohibiting denial of the vote on the basis of race.

These changes in the legal status of racial minorities were not cheaply purchased. They came at the cost of 4 years of Civil War, 529,000 American lives, and sectional bitterness that continues to divide the Nation, although with decreasing force, to the present day.

However, the adoption of the civil rights amendments did not confer immediate equality of legal status upon American blacks. State laws required segregation in public places, restrictive covenants in land deeds prohibiting sale to members of racial minorities, literacy requirements for voting with "grandfather" clauses to protect illiterate whites registered prior to passage of the 15th Amendment, "white primaries", job discrimination, and other discriminatory practices were adopted in much of the Na-

tion to confine blacks to second-class citizenship. And, notwithstanding the civil rights amendments, many of these practices received the express approval of the Federal judiciary. In *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, decided in 1896, the Supreme Court led the way. Upholding a Louisiana law requiring separate railway cars for whites and Negroes, the court said:

> The object of the [14th] amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things, it could not have been intended to abolish distinctions based upon color . . . Laws permitting and even requiring separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally recognized as within the competency of the State legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced. [*Citing Roberts v. City of Boston*, 5 Cush. 198 (1894).]

The court continued:

> We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it . . . Legislation is powerless to eradicate racial instincts, or to abolish distinctions based upon physical differences and the attempt to do so can only result in accentuating the difficulty of the present situation.

FELLOWS, J. It is settled by former decisions of this court that a restraint upon occupancy of the lots of a subdivision by colored persons is valid and enforceable (*Parmalee v. Morris*, 218 Mich. 625, 188 N.W. 330, 38 A.L.R. 1180), although a restraint upon alienation to a colored person is void (*Porter v. Barrett*, 233 Mich. 373, 206 N.W. 532, 42 A.L.R. 1267). The fact that defendants are colored persons is established by their own admissions while on the witness stand and by the finding to that effect by the trial judge who saw them in court. The record does disclose, however, that Mrs. Starks is quite light colored, and she testified that many many times she has been taken for a white woman. Mr. Starks is a parlor car conductor on the Pere Marquette. Defendants appear to be thrifty.

Meaningful enforcement of the civil rights amendments has taken place only in the last quarter century.

Perhaps the decisive moment was the Supreme Court's crucial decision in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), that the equal protection clause prohibits enforcement by State courts of land deed restrictions prohibiting the transfer of land to members of racial minorities.

In the area of education, three cases *

* *Sipuel v. Board of Regents of University of Oklahoma*, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; *Sweatt v. Painter*, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149.

required the admission of Negro students to State-run white institutions of higher education—on the ground that educational opportunities of equivalent value were not made available in state-run schools for black students. Then the dam broke in 1954, with *Brown v. Board of Education*. There the court ruled maintenance of officially segregated public schools unconstitutional—even where State and local authorities have attempted in good faith to provide equivalent facilities, equipment and personnel in both black and white schools.

*Brown* effectively removed the legal underpinnings of *Plessy v. Ferguson*, ended the doctrine of "separate but equal," and laid the groundwork for a new equal protection clause jurisprudence.